767 A.2d 488 (2001)
337 N.J. Super. 398
OMNIPOINT COMMUNICATION, INC., Plaintiff/Appellant,
v.
BOARD OF ADJUSTMENT OF the TOWNSHIP OF BEDMINSTER, Defendant/Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 20, 2000.
Decided February 23, 2001.
*490 Gregory J. Czura, Ringwood, argued the cause for appellant (Czura Stilwell, attorneys; Mr. Czura, on the brief).
John Lore, Dunellen, argued the cause for respondent.
Before Judges BAIME and WALLACE, Jr.
*489 The opinion of the court was delivered by WALLACE, Jr., J.A.D.
Plaintiff Omnipoint Communications, Inc. appeals from the denial of its application for a conditional-use variance to construct a monopole for wireless telecommunications services by defendant Board of Adjustment of the Township of Bedminster (Board). Plaintiff filed an action in lieu of prerogative writs in the Law Division. The trial judge upheld the action of the Board and dismissed plaintiff's complaint.
On appeal, plaintiff contends (1) the Board failed to follow the requirements for granting a conditional use variance pursuant to N.J.S.A. 40:55D-70(d)(3); (2) the Board's decision was arbitrary, capricious, and unreasonable; (3) the trial court erred in requiring plaintiff to demonstrate through an enhanced burden of proof that the variance was not inconsistent with the zoning plan and in relying on the grounds for the variance request to support the denial; and (4) the denial of its application violated the Telecommunications Act of 1996. We affirm in part and remand for further hearing.

I
In February 1998, Bedminster adopted an ordinance aimed at regulating the location of wireless communications structures within the township. The ordinance sought to meet the mandate of the Telecommunications Act of 1996, and at the same time, limit the proliferation of wireless telecommunications towers. The ordinance made wireless communications towers "a conditional use within all zone districts of this Township."[1] In addition, the ordinance provides that wireless communications antennas placed on existing structures shall be a permitted use in all *491 non-residential zone districts and a conditional use in all residential districts. Subsection 13-522.3 sets forth "Visual Compatibility Requirements," including specifications relating to fencing height, location, and square feet of areas dedicated to support equipment, and that the tower:
shall be located, designed and screened to blend with the existing natural or built surroundings so as to minimize visual impacts through the use of color and camouflaging, architectural treatment, landscaping, and other available means, considering the need to be compatible with neighboring residences and the character of the community.
Subsection 13-522.4 establishes "Conditional Use Standards for the Location of Wireless Telecommunications Antennas or Towers," and requires an applicant seeking to construct an antenna in a residential zone or a stand-alone tower in any zone
shall provide a sufficient showing as to [sic]:
1. present documentary evidence regarding the need for wireless telecommunications antennas at the proposed location. This information shall identify the wireless network layout and coverage areas to demonstrate the need for new equipment at a specific location within the Township.
2. provide documentary evidence that a good faith attempt has been made to locate the antennas on existing buildings or structures within the applicant's search area. Efforts to secure such locations shall be documented through correspondence by or between the wireless telecommunications' provider and the property owner of the existing buildings or structures.
3. document the locations of all existing communications towers within the applicant's search area and provide competent
testimony by a radio frequency engineer regarding the suitability of potential locations in light of the design of the wireless telecommunications network. Where a suitable location on an existing tower is found to exist but an applicant is unable to secure an agreement to collocate its equipment on such tower, the applicant shall provide sufficient and credible written evidence of its attempt or attempts to collocate.
4. demonstrate efforts to site new wireless antennas, equipment or towers within the applicant's search area according to the priority schedule below. Such demonstration, shall include the block and lot of any parcel for which the wireless provider has attempted to secure a lease or purchase agreement and copies of all correspondence by or between the wireless provider and the property owner.
In addition, Subsection 13-522.4 includes a priority schedule ranked from one to twelve according to the zone, type of equipment (antenna or tower), location of the equipment, and whether the configuration constitutes a permitted or conditional use. For example, "collocating" an antenna in a commercial/transportation zone is a permitted use with a priority of one; construction of a tower in a commercial zone is a conditional use with a priority ranking in tenth place; construction of a tower in a residential non-scenic transportation corridor, which includes lots with frontage on Routes 202, 206, I-287 or I-78, is a conditional use ranked in eleventh place; construction of a tower in a residential zone is a conditional use ranked in twelfth, or last, place.
The ordinance also establishes minimum setback requirements that towers must be 500 feet from any existing residence, and 2,640 feet from another wireless communications tower. It provides that the tower must be set back from the property line in compliance with the zone district setback or the tower height, whichever is greater, and the equipment compound must be set back in accordance with the zone district setback requirements for an accessory *492 structure. The maximum permissible height of a tower designed to accommodate a single vendor is 100 feet. Subsection 13-522.5(h) provides, however, that a tower "shall be designed and constructed so as to accommodate at least two (2) antenna arrays of separate telecommunications providers."
On March 18, 1998, plaintiff filed an application with the Board for a "c2" variance and conditional use approval for construction of a 70-foot-high communications tower on property located at 1691 Route 206 in Bedminster. The pole would be located 18 feet from the property line in the OP zone. The OP zone was an office and professional commercial district along a transportation corridor. The zone setback requirement was 50 feet from the property line, but the 70-foot height of the tower required a 70-foot setback.
At the hearing before the Board, plaintiff clarified that it was seeking a "d3" use variance because although the tower was a conditional use in the zone in which it would be situated, its construction required relief from the 70 foot setback requirement and from the requirement that the tower be located 500 feet from a residence. There were ten single-family residences located within 500 feet of the proposed location. The closest residences were at a distance of 190 feet across Route 206; two residences were 310 feet; two at approximately 370 feet; one at 440 feet; and two at approximately 475 feet from the proposed tower. Five of those residences, however, were located in the OP zone. Plaintiff also sought a waiver from the fencing requirement based on the existence of vegetation.
The front of the lot, where the tower would be located, was zoned OP, and the rear western portion was zoned as R-2, low density residential. The OP zone was intended as a non-retail transitional area between the village center and residential areas to the north. The OP zone had a minimum lot size of one acre. The proposed three-and-a-half-acre site contained a 3500-square-foot office building with a parking lot for sixteen cars. The pole would be located immediately adjacent to the parking lot and existing vegetation along Route 206. The pole would be a "stealth" structure, designed to look like a light pole, rather than an antenna support structure. Plaintiff submitted a report by Bell Labs stating that the proposed facility complied with applicable FCC regulations and posed no health risk to the immediately surrounding environment.
In support of its application, plaintiff presented the following witnesses, Christopher Olson, a radio frequency engineer employed as a consultant; William Moglino, an architectural expert; Robert O'Connor, a site consultant; and William Masters, a licensed professional planner.
Olson explained that plaintiff held a "personal communications services" or "PCS" license. He explained that PCS signals offered no interference with telephone, television or radio signals and operated at higher frequencies than cellular technology. The higher frequencies were less able than radio frequencies to travel around obstacles such as hills and trees and operated on a line-of-site basis. Olson acknowledged that implementation of plaintiff's network eventually required a relay or tower every mile and a half along New Jersey's major arteries. Plaintiff anticipated needing no additional sites in Bedminster, however, because the large western area of town that had no coverage was less populated.
Olson explained that a site adjacent to Route 287 had been recently approved for Bell Atlantic, but it failed to meet plaintiff's requirements because plaintiff had no plans to boost its own coverage along Route 287, and the Bell Atlantic site left a coverage gap for plaintiff's services of one-half to three-quarters of a mile. Olson said plaintiff's engineers and site acquisition group had examined the "202/206 corridor" but were unable to find existing *493 structures that could provide the necessary coverage.
Moglino explained that plaintiff's tower would consist of a 70-foot-high unipole, designed to look like a light pole, with options for color and decorative ornamentation and the addition of a parking lot-type light. The light would illuminate the existing adjacent parking area. The tower would emit 62 decibels of noise, similar to the sound of a refrigerator and would be placed in front of the property near the highway. At 70 feet the structure would be above tree height, which was necessary. It was necessary for the unipole to be above the 50 to 60 foot high trees in order to operate properly. Moglino believed the pole at its proposed height could only handle one carrier.
O'Connor testified that he researched the town's ordinances and then drove around the town and consulted the tax maps and zoning maps attempting to find suitable locations in the order of the town's priority schedule. He located the property in the OP zone along the highway that had the highest elevation with trees that provided additional screening. Mr. Haltaway, the owner of the property, agreed to lease the site to plaintiff.
O'Connor was of the opinion that the higher elevation and presence of trees made the Haltaway property the most appropriate and least obtrusive location. When asked about "the next best choice," O'Connor replied that "the Haltaway ... property, that was the best choice." He believed no other location had a ground elevation that would permit construction of a pole under the 100-foot-maximum height of the ordinance, but proffered no evidence of any other locations that he had examined. The particular location on the property and the unipole design were chosen in accordance with Haltaway's wishes.
Masters testified that the location and design complied with the ordinance's requirements for stealth designs, visual compatibility, and the size of the tower, and its accompanying equipment compound. The site was particularly suitable because it was centrally located within plaintiff's search ring where it was "needed to rectify a deficient service area." In addition, the site was near "major traffic arteries which are strong generators of wireless telecommunications service." He explained that the unipole would neither significantly impact the environment nor substantially conflict with surrounding land uses. Masters opined that the pole would satisfy the positive criteria for granting a use variance.
As to negative criteria, Masters posited that the public interest at stake was "significant" and the provision of state-of-the-art wireless telecommunications was a use that benefitted the region and the public at large. Furthermore, the detrimental effect from granting the variance, which Masters identified as primarily visual, would be minimized because the proposed pole was 30 feet shorter than the permissible height, and the stealth design, coupled with the existing vegetation, would render the visual impact "aesthetically inconsequential." Masters acknowledged, however, that the only benefactors would be plaintiff's subscribers.
Plaintiff had no written report documenting its efforts to locate sites that would comply with the ordinance's requirements. Masters explained that the FCC required plaintiff to provide "seamless coverage," which might require construction of the facilities in residential as well as non-residential zones.
Many nearby residents objected to plaintiff's application for aesthetic reasons and the potential impact on property values. They expressed concern about the precedent that would be set by granting the variance based on the fact that the pole's location failed to comply with the 500 foot distance requirement. They complained that granting the variance would nullify the ordinance's protection for residents and effectively subject the entire town to the possibility of having a tower *494 constructed nearby because future applicants could claim they were being discriminated against if their applications were denied.
One resident expressed concern about the pole's limitations in that it was capable of servicing only plaintiff's subscribers and transmitting only for a short distance, thus requiring construction of numerous poles to provide the service. Furthermore, he observed that the technology created the potential that each licensee would be requesting the right to build a pole. Another resident suggested other potential locations for the pole, such as the library and a building in town called the Advance Building.
The Board voted seven to one to deny the variance. The Board made various findings in its resolution. The Board found that Olsen offered no specific statistical evidence to support his testimony that a gap in coverage existed between the nearest telecommunications facility to the north and south of the proposed site, and no specific factual information to support his opinion that no location in the needed coverage corridor could fully comply with the 500-foot set back; that testimony from Moglino, O'Connor, and Masters showed the pole was a stealth design that would blend in with the existing surroundings; that the proposed location was specifically suited for the structure by virtue of its topography and elevation and because it was in a non-residential zone, near major highways; that the pole would generate no traffic and have no significant impact on the environment; it would provide state-of-the-art wireless communication; the carrier was licensed by the FCC; that although O'Connor testified he was unable to locate a site in the needed coverage area that would be 500 feet from a residence, he did not provide any further details concerning the specific distance of any residences from any other potential sites; that ten residences were located within 500 feet of the proposed pole; and that numerous members of the general public objected to the application.
Based on these findings of fact, the Board reached the following conclusions.
1. The within application before the Board involves a request for a "d" variance, a "c" variance and for preliminary and final site plan approval.
2. The Board concludes that as a part of the consideration of this "d" variance requests [sic], the Board must determine that special reasons exist for the granting of such relief, as well as that the granting of the variance will not substantially impair the intent and purpose of the Zone Plan and Zoning Ordinance (the negative criteria).
3. The Board also concludes that in deciding the instant case, that it should consider the provisions of Smart SMR v. Fair Lawn Board of Adjustment, 152 N.J. 309, 704 A.2d 1271 (1998) as the Board does not deem the facility proposed herein to be an inherently beneficial use and, therefore, should endeavor to apply the principles of the Smart case to the instant matter.
4. In the Smart case, the Court stated that generally to satisfy the positive statutory criteria, an applicant must prove that "the use promotes the general welfare because the proposed site is particularly suitable for the proposed use".
Further, in order to satisfy the required negative criteria, any applicant, in addition to proving that the variance can be granted without substantial detriment to the public good, must also demonstrate, through an enhanced quality of proof, that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance.
5. When the Board applied the foregoing principles to the instant fact situation, the Board concludes that it is not satisfied that either the positive or negative criteria were satisfied by the applicant herein.

*495 Specifically, the Board does not find that the subject site is particularly suited for the proposed monopole and cabinet because although the Board has been presented with certain evidence indicated [sic] that certain physical features of the property make it attractive for this use, the proposed location of the monopole on the subject property places it within 500 feet of 10 private residential dwellings, the two closest being within 190 feet of the proposed facility, while the recently adopted Township Telecommunications Ordinance, adopted as part of the Township's Land Development Ordinance, requires a minimum set back of 500 feet from private residences.
The Board concludes that the number of houses proposed to be within the aforesaid 500 foot area, and the closeness thereof of several of such houses, is just too great in magnitude and degree to permit the Board to conclude that the subject site is particularly suited for the proposed use.
6. With reference to the negative criteria, as indicated above, the Board concludes that same have also not been satisfied herein, and so concludes on the basis that the applicant has not demonstrated through an enhanced quality of proof that the requested variance is not inconsistent with the intent and purpose of the master plan and ordinance.
With reference thereto, the Board notes that the Township Telecommunications Ordinance was only adopted in 1998, and is an extremely liberal ordinance in that it provides that wireless Telecommunications towers shall be conditional uses within all zone districts in the Township.
Obviously, certain conditions and bulk requirements must be met, within the 500 foot restriction of location of such towers with respect to provide [sic] residences being the only element thereof described to protect residential occupants from the impacts of telecommunications facilities.
With reference thereto, the Board concludes that it does not find an enhanced quality of proof that the (d) variance herein would not be inconsistent with the purposes of the zoning ordinance provisions concerning telecommunications towers, and, in fact, finds that with or without applying such enhanced burden of proof, it could not conclude that the granting of the within variance would not be inconsistent with the purpose of the zoning ordinance.
The magnitude of the existing residences affected, and the extreme proximity of several of such residences to the proposed facility can only lead the Board to the conclusion that the requested variance would be inconsistent with the intent and purpose of the new telecommunications provisions.
7. Further, based upon the foregoing, the Board can only conclude that the intent and purpose of such ordinance provisions would be substantially impaired by the granting of the (d) variance requested herein.
8. The Board further finds that, since there are insufficient reasons for the granting of the "d" variance, the request for a "c" variance is, thereby, rendered moot and no determination is being made on that particular aspect of the application.

II
Plaintiff argues in Points I, II, and IV of its brief that the Board failed to analyze its proposal in accordance with the criteria for granting a conditional use variance and its decision was arbitrary, capricious, and unreasonable. Further, plaintiff contends the trial court erred by requiring plaintiff to demonstrate through an enhanced burden of proof that the variance was not inconsistent with the zoning plan and in relying on the grounds for the variance request as the support for the denial.
N.J.S.A. 40:55D-70(d) governs applications for "use" or conditional use variances. *496 In its current form[2], the statute provides the following powers to the board:
in particular cases for special reasons, grant a variance to allow departure from regulations pursuant to article 8 of this act to permit: (1) a use or principal structure in a district restricted against such use or principal structure, (2) an expansion of a nonconforming use, (3) deviation from a specification or standard pursuant to section 54 of P.L.1975, c 291 (C.40:55D-67) pertaining solely to a conditional use
....
A variance under this subsection shall be granted only by affirmative vote of at least five members, in the case of a municipal board, or 2/3 of the full authorized membership, in the case of a regional board, pursuant to article 10 of this act [40:55D-77 to 40:55D-88]....
No variance or other relief may be granted under the terms of this section, including a variance of other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance....

[Ibid.]
"Conditional use" means a use permitted in a particular zoning district only upon a showing that such use in a specified location will comply with the conditions and standards for the location or operation of such use as contained in the zoning ordinance, and upon the issuance of an authorization therefor by the planning board.

[N.J.S.A. 40:55D-3.]
A conditional use is a use permitted in a particular zone, but only upon certain conditions. That is, a conditional use, as opposed to a prohibited use, is based on the premise that the use is generally suitable to a particular zoning district, but not at every location in the district. Coventry Square v. Westwood Zoning Bd. of Adjustment, 138 N.J. 285, 294, 650 A.2d 340 (1994). Consequently, a conditional use ordinarily will require compliance with special enumerated standards with respect to traffic patterns, street access, parking and such, to assure that it can be compatibly integrated with the district as a whole. Id. at 294, 650 A.2d 340. Deviations from those standards, however, trigger the need for a(d)(3) variance. Id. at 287, 650 A.2d 340. Under Bedminster's ordinance, Section 13-522.2, stand-alone wireless telecommunications towers, such as the one proposed by plaintiff, are conditional uses in all zone districts.
An applicant for a variance permitted by N.J.S.A. 40:55D-70(d), whether for a conditional or prohibited use, must satisfy the statute's "positive criteria" or "special reasons" for the grant of the variance, and its "negative criteria" that require the variance "can be granted without substantial detriment to the public good and that it will not substantially impair the intent and the purpose of the zone plan and the zoning ordinance." Smart SMR of N. Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 323, 704 A.2d 1271 (1998).
The burden for proving special reasons to obtain a variance from compliance with a conditional use is less onerous than that for a use prohibited in the zone. Coventry Square, supra, 138 N.J. at 297-99, 650 A.2d 340. Unlike the high standard of proof required to establish special reasons for a prohibited use, the proofs to support "a conditional-use variance need only justify the municipality's continued permission for a use notwithstanding a deviation from one or more conditions of the ordinance." Id. at 298, 650 A.2d 340.
*497 [4] The Court explained in Coventry Square, that to obtain a conditional-use variance, an applicant must adduce proof:
sufficient to satisfy the board of adjustment that the site proposed for the conditional use, in the context of the applicant's proposed site plan, continues to be an appropriate site for the conditional use notwithstanding the deviations from one or more conditions imposed by the ordinance. That standard of proof will focus both the applicant's and the board's attention on the specific deviation from conditions imposed by the ordinance, and will permit the board to find special reasons to support the variance only if it is persuaded that the non-compliance with conditions does not affect the suitability of the site for the conditional use. Thus, a conditional-use variance applicant must show that the site will accommodate the problems associated with the use even though the proposal does not comply with the conditions the ordinance established to address those problems.

[Id. at 298-99, 650 A.2d 340.]
The analysis of the negative criteria for a conditional-use variance also focuses on the specific deviation and its potential effect on the surrounding properties and the zone plan. In analyzing the first prong of the negative criteria, that the variance can be granted "without substantial detriment to the public good," the board "must evaluate the impact of the proposed [conditional-]use variance upon the adjacent properties and determine whether or not it will cause such damage to the character of the neighborhood as to constitute `substantial detriment to the public good.'" Ibid. (quoting Medici v. BPR Co., 107 N.J. 1, 22 n. 12, 526 A.2d 109 (1987)). In determining the second prong, whether the variance "will not substantially impair the intent and purpose of the zone plan and zoning ordinance," the board "must be satisfied that the grant of the conditional-use variance for the specific project at the designated site is reconcilable with the municipality's legislative determination that the condition should be imposed on all conditional uses in that zoning district." Ibid.
"If, however, the proposed use is inherently beneficial, an applicant's burden of proof is significantly lessened. An inherently beneficial use presumptively satisfies the positive criteria." Smart, supra, 152 N.J. at 323, 704 A.2d 1271 (citing Burbridge v. Governing Body of Township of Mine Hill, 117 N.J. 376, 394, 568 A.2d 527 (1990)).
With an inherently beneficial use, satisfaction of the negative criteria does not depend on an enhanced quality of proof, but instead the grant of the variance depends on balancing the positive and negative criteria. Ibid. See also Sica v. Board of Adjustment of Twp. of Wall, 127 N.J. 152, 160-61, 163, 603 A.2d 30 (1992). When striking the balance, boards must: (1) identify the public interest at stake, recognizing that some uses are more compelling than others; (2) identify the detrimental effect that will ensue from the grant of the variance; (3) study whether the detrimental effect can be mitigated by imposing reasonable conditions on the use; and (4) weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good. Id. at 164-66, 603 A.2d 30.
Moreover, the 1997 amendment to N.J.S.A. 40:55D-70 substantially codified the Sica balancing test. Smart, supra, 152 N.J. at 324, 704 A.2d 1271. Thus, even with an inherently beneficial use, an applicant must satisfy the negative criteria. Ibid. In any event, the Court in Smart declined to recognize mobile communications facilities as an inherently beneficial use. Id. at 329, 704 A.2d 1271.
Before addressing plaintiff's arguments, we note several established principles governing review of zoning matters. A municipal zoning board is entrusted *498 with the sound discretion to determine whether an applicant has met the statutory criteria to obtain a variance. Kaufmann v. Planning Bd. for Twp. of Warren, 110 N.J. 551, 558, 542 A.2d 457 (1988); Home Builders Ass'n of Northern N.J. v. Borough of Paramus, 7 N.J. 335, 341-42, 81 A.2d 753 (1951); Northeast Towers, Inc. v. Zoning Bd. of Adjustment of Borough of West Paterson, 327 N.J.Super. 476, 493, 744 A.2d 190 (App.Div.2000). A board's decision is presumptively valid and we should sustain it unless it is arbitrary, capricious, and unreasonable. Sica, supra, 127 N.J. at 166-67, 603 A.2d 30; Smart SMR, supra, 152 N.J. at 327, 704 A.2d 1271; New York SMS A Ltd. Partn. v. Board of Adjustment of Twp. of Bernards, 324 N.J.Super. 149, 164, 734 A.2d 817 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1210 (1999). Further, a board's denial of a variance is entitled to greater deference than a decision to grant the variance. Northeast Towers, Inc., supra, 327 N.J.Super. at 494, 744 A.2d 190.
With these principles in mind, we turn to plaintiff's contention that contrary to the holding in Coventry Square, the Board failed to focus on the variance sought and any ensuing detrimental effects. Plaintiff essentially argues that its proofs satisfied the special reasons criteria and the Board's findings that the number of houses within the 500-foot area and the "extreme proximity" of several houses to the proposed location were "just too great in magnitude" to permit the variance were misplaced. We disagree.
Here, the variance sought would affect ten adjacent properties. Contrary to plaintiff's contentions, neither the Board nor the trial court merely relied on the existence of the deviation to conclude that the variance should be denied. Rather, the Board clearly stated that it was concerned with the magnitude of the deviation, both in terms of distance and the quantity of residences affected. Consistent with the holding in Coventry Square, the Board was charged with assessing the appropriateness of the conditional use variance by considering the degree of deviations from that standard. Moreover, as the trial judge recognized, the burden of proving the existence of special reasons was on plaintiff, as was the burden of convincing the Board that the site was suitable notwithstanding the deviations. Coventry Square, supra, 138 N.J. at 298-99, 650 A.2d 340. By establishing the 500 foot distance requirement, Bedminster determined that locating communication towers close to a residence was detrimental. Plaintiff failed to show why locating the tower within 500 feet of ten residences was sufficiently mitigated in this case. Although the tower would look like a light pole, its design did not change the fact that it would be much higher than the surrounding treetops and nearby structures.
Since communications towers usually generate little pollution or demand on municipal services, the primary objections to their construction concern the aesthetic impact of the pole on the character of the locality and on property values, in conjunction with fears that the unregulated and competitive nature of the industry will lead to their widespread proliferation. See New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Bd. of Adjustment, 160 N.J. 1, 15, 733 A.2d 442 (1999); Smart SMR, supra, 152 N.J. at 330-31, 704 A.2d 1271; New York SMSA Ltd. Part. v. Board of Adj. of Twp. of Middletown, 324 N.J.Super. 166, 171, 734 A.2d 826 (App. Div.), certif. denied, 162 N.J. 488, 744 A.2d 1210 (1999). Although all communications towers and monopoles may not be aesthetically displeasing, the present state of the technology nonetheless means that they "are often vastly higher than other structures in the municipality, particularly those in residential areas." Smart SMR, supra, 152 N.J. at 331, 704 A.2d 1271. Consequently, some zones and certain sites within a particular zone may be better suited than others for a tower or monopole. Ibid.
*499 In addition, plaintiff failed to present documentary evidence of any attempt to locate its antenna on existing structures, or any effort to locate the antenna in accordance with the priority schedule, both of which are conditional standards set forth in the ordinance under Sections 13-522.4(a)(2) and (4). Further, plaintiff did not present any documentary evidence establishing the existence of a gap in coverage demonstrating the need for new equipment at the chosen location, another conditional standard. Section 13-522.4(a)(1). Clearly, the Board's resolution reflected its concern with the lack of documentation.
"[W]hether or not a ... monopole will substantially impair the character of a neighborhood will depend on the circumstances of each case." Smart SMR, supra, 152 N.J. at 332, 704 A.2d 1271. In our view, the conditional standards imposed by Bedminster's ordinance reflect these concerns by requiring detailed documentary evidence supporting the need for the tower in the particular location sought and by specifying required distances between towers, and between towers and existing residences. The ordinance allowed construction of towers in every zone on either a permitted or conditional use basis. We are satisfied plaintiff failed to establish special reasons to warrant grant of the variance.
Plaintiff also asserts that the Board's decision was arbitrary, capricious and unreasonable. Plaintiff argues that the Board's findings were "perfunctory" and "conclusory" and no evidence was presented to contradict plaintiff's expert testimony that no site would alleviate the problem with the setback requirement. The Board was free, however, to accept or reject the testimony of plaintiff's experts, and we are bound by its choice. Kramer, supra, 45 N.J. at 288, 212 A.2d 153; Northeast Towers, Inc., supra, 327 N.J.Super. at 498, 744 A.2d 190.
As the trial judge observed, plaintiff's "expert's testimony was conclusory, simply stating that the proposed site is the only site to fulfill their needs and no other site was adequate." Olson introduced mylar maps that he said demonstrated a half-mile gap in coverage that would remain if plaintiff located its antenna on a recently approved Bell Atlantic tower. However, he presented neither reports nor calculations to support his conclusions, and no evidence for the conclusion that wireless communications service was unavailable or deficient in the gap area.
O'Connor testified only that he located the highest ground in the OP zone, which was the Haltaway property, approached the owner, obtained his consent, and leased the property. He thought he could not find a lot that was not within 500 feet of a residence, but offered no examples of alternate sites and the number of residences that would be affected. He testified that placing the pole on a site with an elevation lower than the Haltaway property would require a higher pole. He provided no documentation, however, explaining the alternatives of siting a higher pole on a lower elevation that might be located beyond the 500-foot setback area. Plaintiff's experts merely testified that the Haltaway property was the one site that satisfied plaintiff's needs but made no effort to justify their conclusions. Bedminster's telecommunication's ordinance contained explicit requirements with respect to documentary evidence of an applicant's search for a suitable site, and the Board was not unreasonable in rejecting the testimony of plaintiff's experts who made no effort to comply with those provisions.
In short, the Board's factual findings that plaintiff presented no documentary evidence concerning the gap in coverage, or concerning its attempts to locate other, suitable locations that either would be outside the 500-foot residential setback requirement or impact fewer residences, is supported by the record.
Plaintiff also asserts that the Board "misunderstood the positive criteria" *500 by failing to acknowledge that plaintiff's possession of an FCC license established that plaintiff had met its burden concerning the positive criteria and, furthermore, because the Board and the trial court "wrongfully determined" that plaintiff must establish the negative criteria according to an enhanced burden of proof.
In our view, it is necessary to distinguish the special reasons standard to be applied when a telecommunications facility requires a use variance from the standard applicable for a conditional-use variance, such as the one here. For a use variance to construct a telecommunications tower in a zone in which it is prohibited, the positive criteria require a showing that 1) the use serves the general welfare, and 2) the site is particularly suitable for the proposed use. Smart SMR, supra, 152 N.J. at 331-32, 704 A.2d 1271. The existence of a FCC license satisfies only the first of these criteria. Id. at 336, 704 A.2d 1271. The applicant nonetheless must show the site is particularly suited for the tower. Ibid.
On the other hand, the value of a conditional use to the general public is implied by the municipality's determination that the use should be permitted so long as it meets certain requirements. Furthermore, in the absence of any deviation from the enumerated conditions, the site is presumptively suitable. See Exxon Co., USA v. Twp. of Livingston, 199 N.J.Super. 470, 477-78, 489 A.2d 1218 (App.Div.1985). However, we do not believe those presumptions lessen the applicant's need to comply with the special reasons standard set forth in Coventry Square, which focuses on the deviation and its effect on the continued suitability of the site. See Coventry Square, supra, 138 N.J. at 298-99, 650 A.2d 340. We are satisfied the Board engaged in the correct analysis in basing its special needs determination on the magnitude of the deviation.
Plaintiff argues that with regard to its obligation to meet the negative criteria the Board should have applied the balancing test set forth in Sica, supra, 127 N.J. at 165-66, 603 A.2d 30, rather than requiring it to meet the enhanced burden of Medici. Under Medici, supra, 107 N.J. at 21, 526 A.2d 109, an applicant for a variance for a non-inherently beneficial use must establish "by an enhanced quality of proof" that the variance would not be inconsistent with the intent and purpose of the master plan and zoning ordinance. In instituting this standard, the Court in Medici was responding to the practice whereby "expert testimony designed to satisfy the negative criteria was being expressed as an incantation of the statutory phrase." Id. at 22, 526 A.2d 109. The enhanced standard was designed to ensure the negative criteria continued to act as "an essential `safeguard' to prevent the improper exercise of the variance power." Ibid.
The Court in Sica, supra, 127 N.J. at 164, 603 A.2d 30, recognized, however, that both the statutory standard for the negative criteria and the nature of an inherently beneficial use implied the need for a balancing test. First, the legislatively established negative criteria explicitly required the determination of whether the variance would cause "substantial detriment to the public good," such that not every detriment would suffice to deny the variance. Ibid. Second, in the absence of balancing, "a local board's finding that an applicant has not satisfied the negative criteria would always defeat an inherently beneficial use, no matter how compelling the need for that use." Ibid. Consequently, the Court suggested that with an inherently beneficial use, a board should balance the positive and negative criteria by 1) identifying the public interest at stake; 2) identifying the detrimental effect that would ensue from granting the variance; 3) determining if the detrimental effect could be reduced by the imposition of reasonable conditions on the use; and 4) weighing the positive and negative criteria to determine if, on balance, granting the variance would cause substantial harm to *501 the public good. Id. at 165-66, 603 A.2d 30.
In Smart SMR, supra, 152 N.J. at 332-33, 704 A.2d 1271, the Court determined that it would apply a balancing test to determine whether granting a use variance to a telecommunications facility would satisfy the negative criteria, notwithstanding its determination that such a structure was not an inherently beneficial use. The Court concluded the variance could be granted without substantial detriment to the public good. Id. at 332, 704 A.2d 1271. The Court found that a "telecommunications facility is a paradigm for a use that serves a greater community than the particular municipality" and, furthermore, the facility in question would offer services unavailable through existing cellular systems. Ibid. The detrimental effects would be minimal because the tower would produce no noise, vibrations, smoke, dust, odors, heat or glare, and would require little or no municipal services. Id. at 333, 704 A.2d 1271. The pole would not substantially impair the zoning plan because, although abutted on one side by residential zoning, the location was zoned for industrial uses and surrounded on three sides by industrial and commercial uses. Ibid.
Here, the Board's resolution stated that plaintiff had "not demonstrated through an enhanced quality of proof that the requested variance is not inconsistent with the intent and purpose of the master plan and zoning ordinance." Further, the Board found that "with or without applying such enhanced burden of proof" it was unable to conclude the variance would not be inconsistent with the purpose of the ordinance.
In our view, the Board's statement regarding the negative criteria followed the directions in Coventry Square to focus the negative criteria analysis on the deviation. Thus, the Board determined that the variance could not be reconciled with the municipality's previous determination that the 500-foot residence setback should be imposed on all stand-alone towers. Coventry Square, supra, 138 N.J. at 299, 650 A.2d 340. Further, plaintiff presented no documentary evidence of its efforts to locate the tower on properties where it would be 500 feet from the nearest residence or, at least, affect fewer residences. The Board properly focused its concern on the magnitude of the deviation as reflected by the tower's proximity to the homes and the number of homes affected. In short, the Board's conclusion that plaintiff failed to satisfy the negative criteria was reasonably supported by the record.
Moreover, we need not determine whether the Sica's balancing test should apply to the conditional use variance sought here. Simply put, once the Board reasonably concluded that plaintiff failed to establish both the positive criteria and the negative criteria, there was nothing to balance. Both the positive criteria and the negative criteria were on the same rejected side of the scale.

III
Plaintiff contends that the denial of the variance violates the Telecommunications Act of 1996. Specifically, plaintiff argues that the denial of its "applications has `the effect of prohibiting the provision of personal wireless services' in and around the Township, contrary to 47 U.S.C. § 332(c)(7)(B)(i)(II)" and, "constitutes an entry barrier in violation of 47 U.S.C.A. Section 253."
The Telecommunications Act provides:
(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof
(I) shall not unreasonably discriminate among providers of functionally equivalent services; and
(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

[47 U.S.C.A. § 332(c)(7)(B).]
*502 However, the Act also provides: "Except as provided in [47 U.S.C.A. § 332(c)(7) ], nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C.A. § 332(c)(7)(A).
The trial judge rejected plaintiff's contention that the denial of its application violated the Telecommunications Act because it found that, by itself, the mere denial of plaintiff's single application did not indicate that the ordinance violates the statute.
Our Supreme Court has recognized that certain restrictions imposed by the Telecommunications Act parallel those already found in New Jersey law, including the requirement that an agency's decision be supported by sufficient evidence in the record. Smart SMR, supra, 152 N.J. at 326, 704 A.2d 1271. The Court acknowledged that the Act nonetheless imposed two further limitations on local authority, namely, the right to challenge the decision of a local land use agency in federal court and the restriction that a municipality could not prohibit the construction of telecommunications facilities in the town, although it could continue to regulate their location. Id. at 326-27, 704 A.2d 1271.
The record as developed is barren of evidence to establish that the Board's decision had the effect of prohibiting wireless service in the area. We recognize that in Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Bor. of Ho-Ho-Kus, 197 F.3d 64, 70 (3d Cir.1999), the court concluded "that local zoning policies and decisions have the effect of prohibiting wireless communication services if they result in `significant gaps' in the availability of wireless services." A significant gap could be demonstrated by evidence that "a remote user of [the] services is unable either to connect with the land-based national telephone network, or to maintain a connection capable of supporting a reasonably uninterrupted communication." Ibid. The court observed that the Board never determined whether significant gaps in coverage existed, and the plaintiffs had presented "substantial, unrefuted evidence" that callers might be able to achieve a connection from a particular location, but conversation would be difficult and "virtually impossible for users of the hand-held portable phones that dominate the market today." Id. at 74.
Unlike in Ho-Ho-Kus, which involved three different carriers, here only one is involved. Moreover, plaintiff's evidence did not focus on whether the denial of its application would result in significant gaps in the availability of wireless service. Although there was reference in the record to the Bell Atlantic tower which the Board had previously approved, the evidence did not establish whether the mobile telephone service through Bedminster/Route 206 corridor was poor or nonexistent. Further, we note that in Ho-Ho-Kus, the applicants presented experts who used an industry standard scale of one to five to rate the quality of existing wireless services for car phones and hand-held phones in the Borough. Id. at 73-74.
At oral argument, counsel for the applicant and counsel for the Board each recognized that the evidence before the Board did not focus on whether significant gaps in coverage existed. Each expressed that a remand might be appropriate to determine whether the denial of plaintiff's application constituted an act of prohibition. The court in Ho-Ho-Kus cautioned that "as the Telecommunications Act itself dictates, local officials must always ensure that neither their general policies nor their individual decisions prohibit or have the effect of prohibiting personal wire services." Id. at 70.
In light of the deficiencies in the record regarding whether the denial of this application results in substantial gaps of coverages, we conclude the appropriate resolution is to remand the matter to the *503 Board so plaintiff and other interested parties may offer expert testimony concerning this issue. We think it better to take a cautious approach to insure that the Board's decision did not conflict with the Telecommunications Act.
We add one final thought. Just as the court in Ho-Ho-Kus cautioned, even if the Board finds significant gaps in existing service, "the providers still bear the burden of proving that the proposed facility is the least intrusive means of filling those gaps with a reasonable level of service." Id. at 76.
The matter is affirmed in part and remanded to the Board for further proceedings consistent with this opinion.
NOTES
[1] This case, however, involves construction of a separate tower facility.
[2] The underlined portion of this provision incorporates L.1997 c. 145, effective June 30, 1997.