**SITETECH GROUP LTD., Nextel of New York, Inc., and Sprint Spectrum, L.P., Plaintiffs,**

v.

**The BOARD OF ZONING APPEALS OF the TOWN OF BROOKHAVEN, Defendant.**

No. CV 00–1295.

United States District Court, E.D. New York.

March 30, 2001.

Munley, Meade, Nelson & Re by Denise Wagner, Huntington, NY, for Plaintiffs.

Annette Eaderesto, Brookhaven Town Attorney by Barbara M. Wiplush, Assistant Town Attorney, Medford, NY, for Defendant.

### MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiffs SiteTech Group LTD. ("SiteTech"), Nextel of New York, Inc. ("Nextel"), and Sprint Spectrum, L.P. ("SSLP") bring this action against defendant the Board of Zoning Appeals of the Town of

Brookhaven (the "BZA") pursuant to the Telecommunications Act of 1996 (the "TCA"), 47 U.S.C. § 332(c). Plaintiffs challenge the BZA's denial of their request for a special use permit to construct a 150–foot monopole in Miller Place, located in the Town of Brookhaven (the "Town") in Suffolk County, New York. Before the Court are plaintiffs' motion for summary judgment and defendant's cross-motion for summary judgment.

## I. *BACKGROUND*

For purposes of this decision, the record can be summarized as follows. Nextel and SSLP are licensed by the Federal Communications Commission ("FCC") to construct, maintain, and operate personal wireless telecommunications systems in the New York metropolitan area, including Suffolk County. As plaintiffs explain, to provide wireless service, each carrier creates a grid-like pattern of individual "cell sites," or facilities, where an antenna and related equipment are placed. A subscriber using a wireless telephone must be located a short distance from the cell site to receive service. The signal travels from the wireless telephone to the antennas and then connects to a land-based telephone system where the call is completed by a normal telephone route. As a subscriber travels from one area to another, the signal is handed off to the next adjacent cell site. For a subscriber to have continuous service, the area that each cell site covers must overlap to avoid having the call dropped from the service.

Nextel and SSLP determined that there was a "gap" in continuous service in the Miller Place area, and each developed a "search area" where the cell site would have to be located to "fill" that gap. Since their search areas were similar, they sought to co-locate their cell sites. They determined that there were no water towers, buildings, or other structures of sufficient height to service the gap, and they

decided that they needed to construct a 150–foot monopole on which to locate their antennas. Eventually they chose the Aliano Shopping Center on Route 25A in Miller Place as the site, as it was located within their overlapping search areas and was zoned as a "J–3 Business" zone—a location where a communications tower may be situated in the Town.

Under the Brookhaven Town Code (the "Code"), communications towers are permitted in various zoning districts, including, *inter alia*, J–3 Business zones, upon the issuance of a special use permit by the BZA. In this respect, in March 1998, the Town added to the Code article XXXVIII, entitled "Wireless Communications Towers and Antennas." This article provides guidelines for the siting of wireless communications towers and antennas, and includes the following expression of legislative intent:

> [T]he [BZA] hereby determines to establish general guidelines for the siting of wireless communications towers and antennas in order to: (1) protect residential areas and land uses from potential adverse impacts of towers and antennas; (2) encourage the location of towers in non-residential areas; (3) minimize the total number of towers throughout the Town; (4) encourage the joint use of new and existing tower sites as a primary option rather than construction of additional single-use towers; (5) encourage users of towers and antennas to locate them, to the extent possible, in areas where the adverse impact on the surrounding community is minimal; (6) encourage users of towers and antennas to configure them in a way that minimizes the adverse visual impacts of the towers and antennas through careful design, siting, landscape screening, and innovative camouflaging techniques; (7) enhance the ability of the providers of telecommunications ser-

vices to provide such services to the community quickly, effectively, and efficiently; (8) consider the impacts upon the public health and safety of communication towers; and (9) avoid potential damage to adjacent and/or nearby properties from tower failure through appropriate engineering and careful siting of tower structures and/or facilities. Code § 85–452. The Code also requires that new towers be set back from any adjoining lot line a distance equal to at least 150% of the height of the tower, although the BZA, in its discretion, may reduce the setback requirement to 75%, if "the goals of the local law, would be better served thereby." *Id.* § 85–457(B)(4)(a), (c). Consequently, for a 150–foot monopole, a 150% setback requires 225 feet of setback, and a reduced 75% setback requires 112.5 feet of setback.

In August 1999, Nextel and SSLP submitted an Application for a Building Permit to the Town's Building Inspector. The application was denied, and plaintiffs were advised to obtain a special use permit from the BZA. Plaintiffs then submitted an application for a special use permit to the BZA, and in December 1999, a public hearing was held on the permit application.

At the hearing, plaintiffs had a real estate appraiser, a planner, a registered architect, and two radio frequency engineers testify in favor of granting the permit. The real estate appraiser presented testimony that the proposed structure would not have a negative effect on existing property values. The planner testified that the proposed structure would not have a negative effect on the aesthetics of the location. The architect described the proposed building plan and presented evidence to support the soundness of the proposed structure. The radio frequency engineers testified as to the technological necessity of locating the cell site at the proposed location.

Testimony in opposition to the permit application was presented by a number of local residents, a local legislator, several members of the Board of Directors of the Miller Place Civic Association, a representative of the Miller Place Senior Citizens Club, and the President of the Miller Place Historical Society. Much of this testimony addressed the negative aesthetic impact of the proposed monopole, its incompatibility with existing architecture, and the existence of alternative sites. In this respect, a number of residents testified that the proposed monopole would have a negative aesthetic impact on the area.. Testimony described the history of Miller Place; the prevailing architecture and its significance in light of that history; and the architecture of the Aliano Shopping Center and the incompatibility of the structure of the proposed monopole with that architecture and with efforts Miller Place had undertaken to make aesthetic improvements along Route 25A. In addition, members of the Civic Association also presented a visual impact study consisting of a balloon test and photographs to demonstrate the negative visual impact of the proposed monopole.

Evidence regarding the negative impact on property values included letters, petitions, and testimony of local residents that the monopole would negatively impact property values in the surrounding community. Martin Haley, a local legislator, testified that he believed property values would be negatively impacted. In addition, the record included a letter from a local real estate agent expressing the view that the proposed monopole would have a negative effect on surrounding property values.

Among the evidence entered into the record concerning alternative sites was an invitation from the Miller Place Fire District to plaintiffs to discuss building the

monopole on their property. Another letter submitted by the Civic Association had been sent to Nextel offering to assist them in locating an alternative site. Two letters from representatives of KeySpan Energy were entered into the record indicating the availability of Long Island Power Authority ("LIPA") transmission poles for locating antennas. On this issue, plaintiffs' technical experts testified that placement on LIPA transmission poles (purportedly approximately 90 feet) would result in "a small gap" between sites and require additional sites, i.e., additional antennas.

Testimony also addressed the concern that the monopole did not meet the setback requirement. There was evidence demonstrating that the monopole was within 30 feet of retail stores, a beauty parlor, and restaurant—businesses patronized by local residents—and public parking spaces, and that local residents patronizing those businesses would be subject to danger should the monopole fail.

By written decision dated February 9, 2000, the BZA denied the application, concluding that: (A) the "granting of the special permit will impair the value of and have an adverse impact on neighboring residential properties"; the "proposed monopole will be in close proximity to residences and would be the tallest structure"; and "[t]here is insufficient tree coverage and foliage to adequately screen the monopole"; (B) the "proposed monopole will have a negative visual impact on the aesthetics of the Miller Place community"; (C) "since the monopole is operating below [FCC] guidelines, the [BZA] is preempted from addressing the health or environmental effects of radio frequency emissions"; and (D) although plaintiffs "have demonstrated a need for the monopole in the area to eliminate a gap in coverage in the Miller Place area[,] ... [LIPA] transmissions [sic] lines ... should provide adequate coverage to eliminate or greatly reduce the service gap."

## II. *GOVERNING LAW*

### A. *The Telecommunications Act of 1996*

The TCA was enacted "'to provide a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services ... by opening all telecommunications markets to competition ....'" *Cellular Tel. Co. v. Town of Oyster Bay,* 166 F.3d 490, 492–93 (2d Cir.1999) (quoting H.R. Conf. Rep. No. 104–458, at 206 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 124). Recognizing that the expanding telecommunications industry requires construction of wireless facilities, including communications towers, and that local governments are called upon to determine whether such structures may be built, Congress enacted section 704 of the TCA, codified at 47 U.S.C. § 332, to regulate, in part, this procedure. Section 332 provides for judicial review of any local decision denying a request to "place, construct or modify," wireless service facilities. Specifically, any person adversely affected by a state or local decision inconsistent with the requirements of § 332 may commence an action to review that decision. The statute provides for prompt judicial review allowing the party adversely affected to commence an action within 30 days of the adverse determination in any court of competent jurisdiction. 47 U.S.C. § 332(c)(7)(B)(v).

Section 332 seeks to strike a balance between encouraging the growth of telecommunications systems and the right of local governments to make land use decisions. Encouragement of the growth of the telecommunications industry is fostered by the TCA requirement that local authorities act on any request for authori-

zation to construct personal wireless service facilities within a "reasonable period of time." *Id.* § 332(c)(7)(B)(ii). Further, local governments regulating the "placement, construction, and modification" of wireless services facilities are expressly prohibited from: (1) unreasonably discriminating among providers of functionally equivalent services, and (2) prohibiting or having the effect of prohibiting the provision of personal wireless services. *Id.* § 332(c)(7)(B)(i)(I) and (II).

While requiring review of local zoning determinations regarding the placement of wireless facilities, the TCA and the courts interpreting that statute acknowledge the legitimate local interest in such determinations. As recognized by the Second Circuit in *Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630 (2d Cir.1999), the goals of increasing competition and "rapid deployment of new technology" do not "trump all other important considerations, including the preservation of the autonomy of states and municipalities." *Id.* at 639. Rather, "[i]n the context of constructing a national wireless telecommunications infrastructure, Congress chose to preserve all local zoning authority 'over decisions regarding the placement, construction, and modification of personal wireless service facilities,' 47 U.S.C. § 332(c)(7)(A), subject only to the limitations set forth in section 332(c)(7)(B)." *Willoth* 176 F.3d at 639–40. The legislative history of the TCA illustrates the importance of preserving local land use authority. As stated in the Senate Report, § 332 "preserves the authority of State and local governments over zoning and land use matters except in the limited circumstances" specified in that section. Sen. Rep. No. 104–230, at 458 (1996).

### B. *Substantial Evidence Standard*

■ The denial of a request to construct a wireless facility is required to be "in writing and supported by substantial evidence in the record." 47 U.S.C.

§ 332(c)(7)(B)(iii). Denials under the TCA are reviewed under the traditional standard for judicial review of agency decisions. *Cellular Tel. Co.,* 166 F.3d at 494. Under this standard, the district court may neither "engage in [its] own fact-finding nor supplant the [local board's] reasonable determinations." *Id.* Substantial evidence means less than a preponderance of evidence, but more than a scintilla of evidence. *Id.* " 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Universal Camera v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). The record "should be reviewed in its entirety, including evidence opposed" to the zoning decision. *Id.* Moreover, "local and state zoning laws govern the weight to be given the evidence," and "the TCA does not 'affect or encroach upon the substantive standards to be applied under established principles of state and local law.' " *Id.* (quoting *Cellular Tel. Co. v. Zoning Bd. of Adjustment,* 24 F.Supp.2d 359, 366 (D.N.J.1998)).

■ In New York, cellular telephone companies are classified as public utilities for purposes of zoning applications. *Id.* (citing *Cellular Tel. Co. v. Rosenberg,* 82 N.Y.2d 364, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993)). As such, a cellular telephone company's application for a variance must be judged by a local board as to whether the public utility has shown "a need for its facilities" and whether the needs of the broader public would be served by granting the variance, rather than usual standard of "unnecessary hardship." *Id.* (citing *Consolidated Edison Co. v. Hoffman,* 43 N.Y.2d 598, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978)).

Plaintiffs argue that the BZA's denial of its application for a special use permit (1) was not supported by substantial evidence as required by the TCA as to the grounds

of impairment of property values, aesthetics, and adequate coverage in alternative site; and (2) had the effect of prohibiting the provision of wireless services, resulting in violations of 47 U.S.C. § 332(c)(7)(B)(iii) and (i)(II). The BZA argues that its determination was within the scope of its authority and adhered to the requirements of 47 U.S.C. § 332(c)(7)(B). Both parties move for summary judgment.

## III. DISCUSSION

### A. *Summary Judgment Standard*

A party seeking summary judgment must demonstrate that "there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The nonmoving party may defeat the summary judgment motion by producing sufficient evidence to establish a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. *Substantial Evidence*

#### 1. *Aesthetics*

■ "[I]n New York, aesthetics can be a valid ground for local zoning decisions." *Cellular Tel. Co.*, 166 F.3d at 495 (citing *Suffolk Outdoor Advertising v. Hulse*, 43 N.Y.2d 483, 402 N.Y.S.2d 368, 373, 373 N.E.2d 263 (1977)). Although, a reviewing court would not normally "look far beyond [a local board's] citing of aesthetics to find

a valid basis for a local zoning decision, ... under the TCA, a reviewing court can find that aesthetics qualify as a permissible ground for denial of a permit only if ... there was 'more that a mere scintilla' of evidence before the [local board] on the negative visual impact." *Id.* (quoting *Universal Camera v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

■ Initially, plaintiffs argue that because the site is zoned to permit communications towers, the BZA could not deny the permit on the ground that the proposed monopole would have a negative visual impact. Plaintiffs reason that the Town must have taken into account the impact of communications towers and decided such impact would be negligible in areas it specifically chose to allow them. Plaintiffs' argument is without merit. Although there may be circumstances where a local ordinance may give rise to a presumption that the aesthetic impact of a structure allowed by the ordinance was considered when the ordinance was enacted, the fact that the proposed monopole constitutes a permitted use is "'by no means determinative.'" *Willoth*, 176 F.3d at 646 (quoting *WEOK Broad. Corp. v. Planning Bd. of Lloyd*, 79 N.Y.2d 373, 583 N.Y.S.2d 170, 592 N.E.2d 778 (1992)). Moreover, the Code does not demonstrate that the BZA considered and accepted the aesthetic impact of communications towers; rather, it evidences that it "left open for future consideration by the [BZA] on a case-by-case basis the compatibility between a proposed structure and the affected neighborhood." *Id.; see, e.g., Pleasant Valley Home Constr., Ltd. v. Van Wagner*, 41 N.Y.2d 1028, 395 N.Y.S.2d 631, 632, 363 N.E.2d 1376 (1977) (recognizing local board's discretion to evaluate special use permit despite ordinance permitting use). For instance, the statement of legislative intent in the Code specifically identifies as purposes of the ordinance to "encourage

users of towers and antennas to locate them, to the extent possible, in areas where the adverse impact on the surrounding community is minimal" and to "encourage users of towers and antennas to configure them in a way that minimizes the adverse visual impacts of the towers and antennas through careful design, siting, landscape screening, and innovative camouflaging techniques." Code § 85–452. Thus, the BZA is neither precluded from evaluating the aesthetic impact of plaintiffs' proposed monopole nor must it overcome a presumption that the monopole conforms to the neighborhood character.

Upon consideration of the record, this Court concludes that there was substantial evidence—more than a "scintilla of evidence"—to support the BZA's conclusion that the proposed monopole would have a negative visual impact on the aesthetics of the Miller Place community. The record includes testimony by residents and members of civic, historical, and senior citizen organizations, sufficiently knowledgeable as to the historic heritage and nature of the community and the prevailing architecture and appearance of the immediate and surrounding area and community, and the incompatibility of the proposed monopole with that historic nature and heritage and prevailing architecture and appearance. For instance, members of the board of directors of the Civic Association testified as to the heritage and colonial appearance of the Route 25A corridor, their efforts to maintain that heritage and colonial appearance, and the incompatibility of the proposed monopole with those efforts and that architecture. Similarly, the president of the Historical Society and a representative of the local Senior Citizens Club testified to the history of the setting and their organizations' desire to preserve that history. There was a balloon study and photographs supporting the testimony, and there was evidence that the monopole would be the tallest, most obtrusive struc-

ture in the relatively rural area, clearly visible along the Route 25A corridor, with insufficient tree coverage and foliage to screen the proposed monopole. The evidence in the record was not merely "a few generalized expressions of concern with 'aesthetics,'" see Cellular Tel. Co., 166 F.3d at 496, or uninformed speculation as to the visual nature of the proposed monopole, which have been found insufficient evidence on which to base a denial. Id. at 495–96.

Plaintiffs did not present significant features designed to sufficiently reduce or eliminate the negative visual impact of the monopole. For instance, plaintiffs relied on the architect's testimony that the monopole could be painted "any color you like," and the planning consultant's generalized assertion that the area was "not pristine." Plaintiffs evidence did not negate the substantial evidence existing in the record supporting the BZA's denial.

Thus, substantial evidence supported the BZA's denial on the ground that the monopole would have a negative visual impact on the community. Thus, the BZA's denial did not violate the TCA.

2. *Other Grounds*

█ Based on the determination that the BZA's denial on the ground of aesthetics is supported by substantial evidence, this Court need not address whether the BZA's denial of the special use permit on the grounds of impairment of property value and alternative sites were supported by substantial evidence. Nevertheless, a review of the record demonstrates that the BZA's conclusion that the monopole would impair property values is not supported by substantial evidence. Although the BZA has a legitimate purpose in trying to minimize the adverse impact of the monopole, there was no substantial evidence to support the BZA's conclusion that property values would be negatively impacted by

the monopole. The conclusory assertions of residents, Legislator Haley, and a real estate broker do not constitute substantial evidence upon which a denial could be based, particularly in light of plaintiffs' real estate appraiser's testimony, which was supported by his study and determination that property values would not decrease. *See Cellular Tel. Co.*, 166 F.3d at 496 (general, unsupported assertions by residents and real estate agent that property values would decrease held not substantial evidence to support denial, in light of testimony of real estate appraiser who found water tower-based cell sites in other towns had no impact on property values).

■ The record, however, does contain substantial evidence supporting the BZA's conclusion that LIPA facilities presented adequate alternative sites. Although plaintiffs contend that their technical experts established that it would not be feasible to utilize the existing LIPA facilities, plaintiffs evidence suggests only that more than one antenna would be necessary under that alternative.

■ The BZA also argues that it properly denied the special use permit on the ground that there was substantial evidence to support its finding that plaintiffs failed to meet the 150% setback requirement or reduced 75% setback requirement of the Code. Plaintiffs admit that the monopole would not meet the 150% setback requirement (i.e., 225 feet), but assert that the BZA should have reduced the setback to 75% (i.e., 112.5 feet) and that the BZA cannot properly deny the special use permit on a finding that the setback requirement was not satisfied because it was "not contained in BZA's written denial." Memorandum of Law in Opposition to Defendant's Cross–Motion for Summary Judgment and in Further Support of Plaintiffs' Motion for Summary Judgment, at 14. Plaintiffs rely, for instance, on their architect's testimony that there has never been

a failure of a monopole in the Northeast, and that in failures in the Midwest and Southwest the monopole did not simply fall, but "just bent a little bit." This Court agrees with the BZA that the record supports its finding—stated in the findings of fact of its written denial—that the proposed monopole failed to meet the setback requirement. There was evidence demonstrating that the monopole was within 30 feet of businesses patronized by local residents and public parking spaces. Thus, these businesses and public parking spaces were well within the 150% setback—and apparently even a 75% reduced setback. The legislative intent as specified in the Code requires the BZA to "consider the impacts upon the public health and safety of communication towers," and to "avoid potential damage to adjacent and/or nearby properties from tower failure through appropriate engineering and careful siting of tower structures." Code § 85–452. That several businesses regularly patronized by local residents were within 30 feet of the proposed monopole supports the BZA's finding. The threat of danger to the public and to these public places of business are not mitigated or eliminated merely because, as plaintiffs contend, there has never been a tower failure in the Northeast or that other failures were less severe than a total failure. And, clearly, plaintiffs do not suggest that the evidence established that a monopole could never fail more substantially than "bend[ing] a little bit," such as collapsing or falling over. There was substantial evidence in the record to support the BZA's finding that the 150% setback requirement and reduced 75% setback requirement were not met. Thus, the BZA did not violate the TCA to the extent it found the monopole did not meet the setback requirement.

## C. *Prohibition of Wireless Services*

■ Plaintiffs claim that the BZA's denial of a special use permit constitutes a

prohibition of wireless services in violation of the TCA. The Act's ban on prohibiting personal wireless services precludes a local board from denying an application for construction of a wireless service facility "that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines." *Willoth*, 176 F.3d at 643. In other words, a local board may reject such an application "if the service gap can be closed by less intrusive means." *Id.* at 642. Plaintiffs argue that the required showing established in *Willoth* was expressed by the Third Circuit in *APT Pittsburgh Ltd. Partnership v. Penn Township*, 196 F.3d 469 (3d Cir.1999), which explained:

> [I]n order to show a violation of subsection 332(c)(7)(B)(i)(II) under *Willoth*, an unsuccessful provider applicant must show two things. First, the provider must show that its facility will fill an existing significant gap in the ability of remote users to access the national telephone network. In this context, the relevant gap, if any, is a gap in the service available to remote users. Not all gaps in a particular provider's service will involve a gap in the service available to remote users. The provider's showing on this issue will thus have to include evidence that the area the new facility will serve is not already served by another provider.

> Second, the provider applicant must also show that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve. This will require a showing that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs,

placement of antennae on existing structures, etc.

*Id.* at 480. Plaintiffs assert that they demonstrated the need for the monopole in the area to eliminate a gap in coverage, and that they have proposed the least intrusive means and the only feasible plan.

A review of the record, however, indicates that the "gap" plaintiffs demonstrated existed was the "gap" in their particular service. Indeed, evidence in the record shows that the area was being serviced by at least two other providers. To establish a violation of § 332(c)(7)(B)(i)(II), it "is necessary for the provider to show more than that it was denied an opportunity to fill a gap in its service system." *APT*, 196 F.3d at 480. Moreover, as the Second Circuit stated in *Willoth*, "once an area is sufficiently serviced by a wireless service provider, the right to deny applications becomes broader. State and local governments may deny subsequent applications without thereby violating subsection B(i)(II)." *Willoth*, 176 F.3d at 643. Thus, plaintiffs demonstration of a gap in their particular service did not obligate the BZA to approve their application.

In any event, plaintiffs did not unequivocally establish that their proposed monopole is the least intrusive means or even the only feasible plan. As noted previously, although plaintiffs contend that their technical experts established that it would not be feasible to utilize the existing LIPA facilities, plaintiffs evidence suggests only that use of existing LIPA facilities would result in "a small gap" and require more than one antenna. However, the TCA does not require 100% coverage. *See 360 Degree Communications Co. v. Board of Supervisors*, 211 F.3d 79, 87 (4th Cir.2000) ("The Act obviously cannot require that wireless services provide 100% coverage. In recognition of this reality, federal regulations contemplate the existence of dead spots, defined as 'small areas within a ser-

vice area where the field strength is lower than the minimum level for reliable service.'"); *see also Willoth,* 176 F.3d at 643–44 (holding denial of application to construct towers to fill holes in coverage will not amount to prohibition of service where lack of coverage likely will be *de minimis,* as "holes in coverage are very limited in number or size"). That plaintiffs' use of the LIPA facilities may be less than optimal does not constitute a prohibition of wireless services. Plaintiffs' expert testimony indicating that a 150–foot monopole would enable it to fill their service gap, did not demonstrate that it was the least intrusive means or the only means, but that it was the minimum to cover the area without additional sites. Rather, the evidence supported the BZA's conclusion that there were alternative, lesser intrusive means than the proposed placement of a 150–foot monopole in the shopping center. As the Second Circuit recognized in *Willoth,* there are "numerous ways to limit the impact of a cell site," including "select[ing] a less sensitive site," "reduc[ing] the tower height," and "us[ing] a preexisting structure," *Willoth,* 176 F.3d at 643—ways that apparently were open to plaintiffs.

In addition, plaintiffs have not shown that reasonable efforts would be futile. *See Town of Amherst v. Omnipoint Communications Enterprises, Inc.,* 173 F.3d 9, 14 (1st Cir.1999) ("[T]he burden for the carrier invoking this provision [i.e., 47 U.S.C. § 332(c)(7)(B)(i)(II)] is a heavy one: to show from language or circumstances not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try."). Members of the Civic Association offered to help plaintiffs locate another suitable site, and the Miller Place Fire District offered the use of its property for locating a monopole. Plaintiffs cannot assert that these efforts would be futile, as it appears that plaintiffs have not even pursued them, and there is no indication that the BZA would not approve another option.

Because plaintiffs have not met the burden of establishing that the BZA's denial amounted to a prohibition of personal wireless services, and because there was substantial evidence supporting the BZA's conclusion that there are less intrusive means, the BZA's denial did not amount to a prohibition of personal wireless services.[1]

## IV.  CONCLUSION

For the above reasons, defendant's motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied. The Clerk of the Court is directed to enter judgment for defendant and against plaintiffs, and to close the file in this matter.

SO ORDERED

---

1. Plaintiffs also purport to assert a claim under § 1983 for violation of the TCA. Even assuming plaintiffs could state a claim under § 1983, based on this Court's determination that the BZA did not violate the TCA, plaintiffs' purported § 1983 must be dismissed.