801 A.2d 336 (2002)
352 N.J. Super. 575
SPRINT SPECTRUM, L.P., and New York SMSA Limited Partnership d/b/a Bell Atlantic Mobile, Plaintiffs-Appellants,
and
Omnipoint Communications, Inc., Plaintiff,
v.
BOROUGH OF UPPER SADDLE RIVER ZONING BOARD OF ADJUSTMENT, the Mayor and Council of Upper Saddle River, and the Borough of Upper Saddle River, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued April 24, 2002.
Decided June 7, 2002.
*338 Gregory J. Czura, Ringwood, argued the cause for appellant (Czura Stilwell, attorneys; Mr. Czura, on the brief).
David L. Rutherford, Ridgewood, argued the cause for respondent Borough of Upper Saddle River Zoning Board of Adjustment.
Robert T. Regan, Westwood, argued the cause for respondents the Mayor and Council of Upper Saddle River and the Borough of Upper Saddle River.
Before Judges KING, WECKER and WINKELSTEIN.
*337 The opinion of the court was delivered by KING, P.J.A.D.
This appeal involves the proposed construction of a wireless communications tower or "monopole" on property owned by a volunteer fire department in a residential section of the Borough of Upper Saddle River (Borough). An application for use variances submitted by three wireless communications providers who wish to collocate on the monopole was denied by the Upper Saddle River Zoning Board of Adjustment (Board). A complaint in lieu of prerogative writs filed in the Law Division by the providers (appellants) was dismissed, based upon the trial judge's sua sponte ruling that a volunteer fire department lacks authority to enter into a commercial lease agreement.
On appeal, the providers argue that, as a private, not-for-profit corporation, a volunteer fire department has authority to lease its property pursuant to N.J.S.A. 15A:3-1(a)(5). Appellants also contend that, under the circumstances of this case, the "effective prohibition" provision of the Federal Telecommunications Act (TCA), 47 U.S.C.A. § 332(c)(7)(B)(i)(II), prevails over local zoning ordinances and requires that this application be granted. Finally, appellants allege that the Borough exhibited a lack of good faith and ask this court to impose an equitable "builder's remedy" which would require the Borough to make municipal property across the street from the fire station available for construction of a monopole.
Based upon our statutes and case law, a volunteer fire department may lease its real property to a commercial enterprise. The holding of the trial judge to the contrary is in error. Although the nearby municipal site would be a much better location for the monopole, there is no authority which would allow the court to order the Borough to enter into a lease with the wireless communications providers. We need not reach appellants' equitable remedy request.
The preemptive effect of the TCA's effective prohibition provision, however, is a difficult question which is unresolved in New Jersey. The few decisions which address the issue are somewhat inconsistent. Several federal circuit courts have recently addressed § 332(c)(7)(B)(i)(II); the analysis used in the Third Circuit is the most soundly reasoned and widely accepted. We conclude that the judgment of dismissal must be vacated and the Board's decision reversed. Denial of this application effectively prohibits the availability of personal wireless service in a substantial portion of the Borough. We reverse and order the Board to approve the variances requested by the wireless communications providers.

I
On September 30, 1998 plaintiffs Sprint Spectrum, L.P. (Sprint), New York SMSA Limited Partnership d/b/a Bell Atlantic Mobile (Bell Atlantic), and Omnipoint *339 Communications, Inc. (Omnipoint) filed an application for variances from the provisions of the Zoning Ordinance of the Borough in order to construct a 155-foot high monopole on property owned by the local volunteer fire department. The Board conducted public hearings on the application on fourteen occasions between December 17, 1998 and November 18, 1999. On December 16, 1999 the Board adopted a resolution denying plaintiffs' application in its entirety.
Plaintiffs filed a complaint in lieu of prerogative writs against the Board, the Borough, the Borough Council and the Mayor in the Superior Court, Law Division on January 24, 2000. The complaint alleged that the Board's action violated New Jersey's Municipal Land Use Law, N.J.S.A. 40:55D-1 to -136, and the TCA, 47 U.S.C.A. § 332(c)(7)(B); the Borough's refusal to make municipal property available for the monopole represented an illegal entry barrier; and the Borough's zoning ordinance contained illegal and invalid provisions. On May 8, 2000 plaintiffs filed an amended complaint which added a civil rights claim for money damages and counsel fees pursuant to 42 U.S.C.A. § 1983.
On October 11, 2000 the Borough amended portions of its zoning ordinance governing wireless telecommunications towers and antennas. By amending these selected sections, the Borough mooted most, if not all, of plaintiffs' arguments as to the legality of the ordinance.
At trial on November 30, 2000 no new evidence was introduced but the parties relied upon the record before the Board. The judge stated that she had not yet read the Board transcripts and she would let counsel know at a later date if a plenary hearing on technical questions was necessary.
On February 6, 2001 the judge issued an oral decision affirming the Board's denial of plaintiffs' application. The judge found that the volunteer fire department had no power to enter into a lease with plaintiffs. The judge also remarked that there was "not even a scintilla of evidence" to show that there was any interruption in the national telephone network in Upper Saddle River because the area was "fully covered by land lines." Sprint and Bell Atlantic filed a timely notice of appeal on April 5, 2001. Omnipoint did not appeal from the final judgment.

II
Plaintiffs are licensed by the Federal Communications Commission (FCC) to provide wireless communications services in the New York City metropolitan area, which includes eleven counties in northern New Jersey. Sprint and Omnipoint employ personal communications services (PCS) technology which uses high-frequency, digital transmissions to connect subscribers to the national telephone-switched network. Bell Atlantic utilizes both digital technology and the older analog system, which operates at lower frequencies, to provide customers with wireless telephone service.
Plaintiffs' FCC licenses require them to provide reliable service throughout their coverage area. In order to achieve this service, they must create a network of individual wireless communications facilities or "cell sites," which consist of radio antennae and related equipment that send and receive radio signals to and from subscribers' cellular phones. See generally Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 491 (2d Cir.1999) (explaining how cellular coverage systems are designed). The cell sites are arranged in a honeycomb pattern, each bordering and slightly overlapping the next so that a traveling subscriber's signal is handed off *340 from one site to another without interruption. See generally APT Pittsburgh Ltd. P'ship v. Penn Tp., 196 F.3d 469, 471 (3d Cir.1999) (explaining how wireless telephone systems operate). Because the handsets operate at very low power levels and employ high frequency radio waves, cell sites must be placed at fairly close intervalssometimes within a few miles of each other. Town of Oyster Bay, 166 F.3d at 491. Factors which influence the spacing of cell sites include the local topography, population density, and ground structures. See generally Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 635 (2d Cir.1999) (explaining the technical requirements of cellular communications). If an area is not adequately covered by cell sites, communication can become impaired or unreliable. Ibid.
A good wireless signal essentially mimics a landline connection. If the signal degrades, an analog handset begins to produce scratches, pops and clicks, while a digital handset might lose syllables or suffer from an echo. If the signal becomes poor, an analog conversation will be exceptionally noisy and eventually may be dropped; a digital conversation will be lost abruptly without warning.
Cell sites can be placed on existing structures such as buildings, billboards and utility poles or on newly-erected communication towers. See Penn Tp., 196 F.3d at 472 (describing location of cell sites). When a new tower is built, it is typically a monopolea cylindrical structure usually eighty to 150-feet in height, made of galvanized, structural steel which tapers from a diameter of five or six feet at the base to about sixteen to eighteen inches at the top. On the monopole, antenna arrays are attached for each wireless communications provider located at the site. Commonly, providers collocate their antennae in order to minimize the number of sites needed in a particular area. Coaxial cable connects the antennae with equipment at the base of the monopole, which transmits subscribers' calls via hardwire telephone lines to a main switching office where they are routed onto the national telephone network.
Plaintiffs here propose to construct a monopole on property owned by the Upper Saddle River Volunteer Fire Department. A fire department building, parking lot and one-car garage are currently located on the property, which is slightly under an acre in size. On top of the thirty-foot high firehouse is a twenty-foot guyed tower which holds the fire department's communications antenna. The lot and surrounding area is zoned R-1 residential. Across the street from the property is a municipal complex consisting of the Borough Hall, ambulance corps, police station and 100-foot-high police communications tower. Three schools border the lot, with athletic fields directly abutting the property on the west. To the south are a few single-family homes.
Plaintiffs want to construct a fenced compound, fifty-feet deep by forty-feet wide, at the rear of the fire department's property. The compound would be enclosed by a six-foot-high chain-linked fence surrounded by eight-foot-high blue spruce trees. Located within the compound would be the monopole, a Bell Atlantic equipment shelter, seven Sprint equipment cabinets on a concrete slab, and an Omnipoint equipment cabinet on a concrete slab. The monopole would be 155-feet high and consist of the Omnipoint antenna array at 120 feet; the Bell Atlantic antenna array at 130 feet; the Sprint antenna array at 140 feet; a lightning rod; and the fire department's antenna at the very top.
At the time of the application and hearings, the Borough's zoning ordinance specifically permitted antennae and towers located *341 on municipal property. Although such an arrangement required approval by the Borough, it did not require formal review by the Board. Further, towers and antennae were designated as conditional uses in industrial and commercial zones. Cell sites were not permitted in residential zones. Accordingly, plaintiffs sought restricted use variances pursuant to N.J.S.A. 40:55D-70(d)(1).
As proposed, the monopole would have a rear-yard setback of 57.2 feet, side-yard setbacks of 33.5 feet and 75.2 feet, and a front-yard setback of 342.3 feet. The rear and side-yard setbacks do not conform with the minimums established by the zoning ordinance. The monopole would be located about 187 feet from the corner of the nearest school building, 80 feet from the adjoining athletic field, 33.5 feet from the nearest private residence and 667 feet from the police communications tower. These distances do not conform with the minimum separation requirements in the zoning ordinance. In all, the Borough engineer found that construction of the monopole and its accessory equipment would require seventeen bulk variances.
At the Board hearings, each plaintiff presented testimony from a radio-frequency (RF) engineer: Paul Grunwald for Sprint; Christopher Olson for Omnipoint; and Thomas May for Bell Atlantic. The testimony of these experts was entirely consistent and corroborative. Most of the Borough is located in a deep river valley with steeply graded hills on either side. A third hill runs north-south through the Borough just west of the valley. With elevations of approximately 450 feet, these hills represent some of the highest terrain in the regional coverage area. It is apparent from the U.S. Geological Survey topographic map that the Borough lies within a bowl-shaped depression with very steep hills to the east and west and slightly lower, more gently sloping hills to the north and south.
The topography of the area presents unique challenges to providing reliable wireless communications service. The sections of the Borough zoned for industrial and commercial use lie along Route 17, which runs more-or-less parallel to the valley to the west of the intervening hills. Because radio frequencies in the ranges used by wireless communications do not bend or scatter, cell sites located along Route 17 cannot reach down into the valley to transmit or receive signals. Due to the line-of-sight nature of the higher radio frequencies, the intervening hills create "shadows" on the western slopes of the valley which are impervious to signals from the Route 17 antennae. In order to provide reliable wireless service inside the valley, a cell site must be located within the valley.
Each of the plaintiffs conducted a drive-test study of the Borough in order to demonstrate the gap in coverage that exists in the valley. In a drive-test study, a specially equipped vehicle travels the major highways in an area scanning signal strength through a specified frequency range. Measurements are obtained by using a custom-designed cellular handset which transmits data to a computer which is connected to a GPS positioning system. The measurements are then processed by proprietary computer programs which combine them with local terrain data to produce a plot or "propagation study" of the radio-frequency coverage within the area.
Sprint's coverage map revealed that a small section of the Borough along Route 17 is covered by Sprint, but the main portion of the Borough within the valley is not. Omnipoint's study yielded a similar conclusionabout 80% to 90% of the Borough is not covered by Omnipoint service.
*342 Bell Atlantic's plot revealed a large area within the center of the Borough where its coverage is not reliable. Because of the better propagation obtained at analog radio frequencies, Bell Atlantic's coverage is somewhat better than that of Sprint and Omnipoint. However, the overall coverage level is still deficient. A subscriber traveling down the center of the valley would likely hear static in an analog call and probably end up dropping the call. A digital phone call would certainly be dropped. These conclusions are supported not only by Bell Atlantic's coverage plots but also by actual statistical data generated by existing cell sites which record the rate of dropped calls within an area.
Each RF engineer testified that a cell site at the proposed location would drastically improve wireless communications within the valley. This conclusion is the result of coverage plots obtained after a crane hoisted a portable transmitter to the height of the proposed monopole and drive-test studies were conducted on the strength of that signal.
All of the experts were asked why plaintiffs could not satisfy their needs by simply constructing a larger, more powerful antenna array on high ground outside the valley. Each explained that there are three basic reasons why this would not be possible. First, the steepness of the valley walls would still cause shadows on the downslopes away from the antenna. Second, a large antenna covering a great distance would interfere with other antennae in the system. Digital providers are each assigned a specific operating frequency and every base station in a provider's network transmits at exactly that frequency. A large site outside the valley would not only reach subscribers inside the valley but would also extend to all subscribers within its line-of-sight, causing static and cross-talk, and degrading the overall service. Interference is particularly troublesome to analog providers, where each call is carried on its own channel within the allotted frequency range. Because the number of available channels is limited, they must be used over and over again within the coverage area. Third, cell sites have a limited capacity. With digital "CDMA" technology, all calls are carried on the same frequency simultaneously. The base station recognizes and differentiates calls by a mathematical prefix code transmitted by the handset. The more calls which come into the base station, the more difficult it is to recognize any individual call, until at some point the number of incoming calls exceeds the system's capacity. A helpful analogy is to imagine standing in a room where several people are talking at the same time. When only a few people are talking, you can differentiate each conversation by the tone of the speaker's voice. However, as the number of speakers increase, it becomes impossible to distinguish one conversation from another because the words become lost in the general background noise.
The monopole proposed by plaintiffs will have the capacity to carry 128 simultaneous phone calls per provider. This is well-suited to the coverage needs in the Borough. An antenna covering more territory would quickly become overwhelmed in an area like Bergen County which has a very large subscriber base.
The Board retained its own RF expert, Charles Hecht, to provide an independent technical analysis of plaintiffs' proposal. Hecht owns a broadcast telecommunications engineering consulting firm which practices before the FCC on technical matters such as antenna system design and propagation studies. He designed the first expanded band AM radio station in the United States and has written many articles on RF engineering. He currently *343 serves as an RF consultant to several New Jersey municipalities.
After carefully reviewing the exhibits and testimony, Hecht concluded that acceptable wireless service is not present in the Borough. He said: "[T]here is not coverage that is substantially better than average for the applicant in the proposed service area ... therefore a technical need exists for service." Hecht had a clear understanding of how the drive-tests were performed and how the coverage maps were prepared. Plaintiffs did not define good reception in any exotic or non-traditional manner, but rather used a signal strength which is accepted by many boards in New Jersey.
Board members questioned Hecht about whether he had seen the "raw data" that was used to prepare the coverage maps and asked him what additional information he needed to review in order to comment further on the conclusions of plaintiffs' experts. Hecht replied, "if it were a marginal situation, drive test data would conclusively answer the question in a positive or in a negative. Frankly, it really, coverage-wise, is not that marginal. However, I'm more than happy to review any drive test data. But it's not a marginal coverage situation."
One month later, Hecht testified that plaintiffs had provided him with additional information and, at his direction, had prepared specific maps showing gradations of signal strengths throughout the area. He examined the actual graphs of the drive-test data, which plotted the measured signal strength at specific locations in the Borough. Once again, Board members expressed alarm that Hecht had not looked at the "raw data." In response, Hecht explained that drive-testing is "an automated, computer automated process in which a device, for lack of a better word, makes hundreds of thousands of telephone calls and logs the relative success and quality of that call ... into some sort of hard drive or storage device. And then that output is just plotted." The computer programs used to process signal strength measurements operate objectively no matter who is using them. Unless the output has been deliberately altered by the field technicians, the resulting plot incorporates the reality in the field. Thus, he said, the data which the computer plotted was the actual "raw data" for the tests.
Board members persisted in questioning Hecht about why he did not obtain the "raw data." Hecht replied that to comply with the Board's request, he would have to somehow go inside the software program and copy the hundreds of thousands of bits of information stored there. Such a project would be very difficult, if not pragmatically impossible. He repeatedly insisted that it was impossible to get the information the Board was requesting.
Commenting on the technical information that he did review, Hecht stated that Omnipoint's existing service in the Borough is "little to none" and that there is a need for coverage. "Omnipoint's proposal to fill the coverage gaps, based on what I saw in reality, seems to be reasonable. It doesn't seem to be overkill. And it does seem to be sufficient to provide service to the area."
Bell Atlantic's signal levels are stronger than the other two providers, but still not adequate to provide consistent, quality calls. Its coverage is unreliable in over 50% of the Borough. Bell Atlantic's proposal to collocate on the monopole was not unduly burdensome and will close the gap in service in the area. Hecht could not make a general conclusion about Sprint's coverage because its engineers had refused to assign specific dBm values to the plotted signal levels, as he had requested.
*344 Hecht said that placing the monopole at the alternate site proposed by the Boroughmunicipal property along Route 17would not provide service to the entire valley. However, locating at the Borough police station across the street from the proposed fire department site would provide satisfactory service.
Hecht returned one month later to testify about additional testing he performed in an attempt to address Board members' concerns about how plaintiffs performed the drive-tests. Hecht took two standard Sprint handsets and drove along the main streets in the Borough attempting to make phone calls. In 90% of the locations, the handsets reported "call failed." In the other 10% of the Borough, Hecht was able to make calls, but they could not be maintained. He concluded that "Sprint does not have a usable signal in Upper Saddle River as it stands right now." Hecht compared his test results with Sprint's original charts and noted that his results indicated an even poorer level of coverage than did the originals.
When asked about the effect of constructing additional sites along Route 17, Hecht explained:
You're still going to have to deal with clearing that ridge because the ridge is between that site and, again, you guys drop down into the valley. So it is possible you're going to pick up some spotty coverage here or there, but whenever you have a big ridge present, regardless of who the carrier is, who, what, where, when, it's physically impossible if it can't see in there and there will be a very large shadow area behind the ridge. Again, if you want to see this, you can see the topography for yourself.
Hecht testified that the behavior and propagation of radio waves is a science. These waves do not propagate through hills. The prospect of providing reliable wireless communications to the valley from a cell site located outside of the valley is unlikely, based upon the laws of physics and radio frequency science.
Larry Rauch, assistant fire chief, testified as a non-expert, fact witness about the fire department's communications system. Rauch has served with the Upper Saddle River Volunteer Fire Department for twenty-nine years and had been fire chief. He is very active locally, state-wide and nationally in the recruitment, training and coordination of fire fighters.
According to Rauch, the current radio communications available to fire fighters in the Borough are not sufficient to meet their needs. The whip antenna atop the firehouse provides communication between the department headquarters and fire fighters in the field. The system is only about 50% reliable and there are quite a few areas of the Borough from which portable radios will not reach the firehouse. As a backup, the chief and assistant chief had cell phones installed in their cars. The cell phones, which use AT & T as a provider, are not reliable either. There are many dead zones throughout the Borough, the largest at the firehouse itself.
Rauch believes that placing the fire department's antenna at the top of the proposed monopole will improve the communications situation. Hecht, acting as an advisor to the Board, agreed that raising the antenna to the proposed height would make radio communications "significantly better."
Thomas Smith, who designed the police department's communications system, testified that a radio system using repeater technology would also solve the fire department's problem, but would cost about $150,000 to implement. Placing the fire *345 department antenna on top of the monopole would work just as well at no cost.
Plaintiffs presented testimony from Louis Cornacchia, an RF engineer, who testified as an expert concerning the health and safety impact of the monopole. At the point of greatest cumulative impact, the emissions from the monopole, operating at full capacity, would be 0.264% of the maximum limit set by the FCC. Fully occupied and operated, the monopole would be in compliance with federal guidelines everywhere in the Borough with respect to radio emissions.
Peter Papay, a project engineer who prepared the site plan, testified about the specifics of the proposed monopole. Although only three providers had applied to collocate at the site, it would be better planning to allow for the eventual placement of five commercial antenna arrays, because there are five wireless communications providers licensed to operate in the coverage area. Originally, AT & T had planned to collocate on the monopole, but later withdrew from the project. Nextel has not been involved with the project, but might be interested in locating at the site in the future.
David Karlebach testified as a professional planning expert on behalf of plaintiffs. He noted that the area around the firehouse, although zoned residential, contains numerous non-residential uses which would create a "substantial buffer" of 72.27 acres around the proposed monopole. A radio tower is a common accessory structure incidental to fire departments, police departments and ambulance corps. Thus, the monopole would not be out of context with the existing uses in the area. Further, it would replace an existing tower and not increase the number of towers within the community. The monopole would produce no noise, vibrations, or odor, nor would it place an increased demand on municipal services. Although the monopole would have a visual impact on the surrounding area, the Borough previously determined that the 100-foot-high police tower, located only 700 feet away from the proposed site, did not have a negative impact on nearby residences.
Robert Heffernan testified as an expert in real estate appraisal on behalf of the Board. After discussing studies involving the effect on housing prices caused by a 300-foot-high guyed television broadcast tower, a water tower, and high voltage electrical lines, Heffernan concluded that the monopole would reduce property values in the area from 12% to 20%.
The Board also presented testimony from Stanley Slachetka, an expert in land use planning. Slachetka said that there is some validity to plaintiffs' argument that the public and quasi-public uses of property surrounding the proposed site gives the area more the feel of a community center than a residential neighborhood. He also acknowledged that mature deciduous tree cover buffers the site from the residential neighborhood to the south. Nevertheless, Slachetka concluded that the site is not particularly suited for the proposed use because the insufficient size provides no means to offset the visual and aesthetic impact of the monopole.
The Borough engineer, David Hals, testified concerning the variances required in order to construct the proposed monopole. On the day that a crane was elevated to a height of 155 feet over the site, Hals noted that the monopole was visible for over 1,000 feet along West Saddle River Road. The monopole will also be visible from the Borough Hall, the schools and the residences on Holly Drive.
Plaintiffs presented real estate appraiser Mark Tinder as a rebuttal witness, who disputed the methods and conclusions *346 of Heffernan. Over the course of four hearings, Tinder presented evidence and answered questions in support of his conclusion that there was no conceivable property value impact associated with the construction of the proposed monopole. In his day-to-day work as a relocation appraiser, Tinder has never seen any measurable value impact from a cell phone tower.
The public participated extensively in the Board hearings. In addition to questioning each witness, local residents had two opportunities to present evidence regarding plaintiffs' application. Although some residents expressed concern over the effect of the proposed monopole on property values, the primary focus of the testimony was on issues of safety. Residents were particularly concerned that the monopole would be located close to three schools.
After a brief discussion concerning the positive and negative aspects of the proposed monopole, the Board voted unanimously on November 18, 1999 to reject plaintiffs' application. A forty-eight page written resolution, memorializing the Board's decision, was adopted on December 16, 1999 by a unanimous vote of the Board.
The Board reviewed the testimony of plaintiffs' RF experts and concluded that they had failed to provide the information needed to permit the Board and its consultant to properly evaluate the level of service within the Borough. The Board concluded that
based upon the fact that Route 17 is currently being served adequately, and given the fact that other roadways to be served by the proposed tower are not "major" thoroughfares, and based upon a total lack of evidence relating to wireless service being provided by carriers other than the applicants, the Board finds that the applicants did not prove the existence of a significant gap.
The Board did not review the testimony of its own consultant, Hecht, before reaching this conclusion.
The Board dismissed the testimony of Rauch as non-expert and unqualified. It found that there was "no competent evidence in the record to support the proposition that the relocation of the Fire Department antennas on the top of the monopole would necessarily improve communications."
The Board reviewed the presentations of the real estate appraisers and land use planners in depth and concluded that its own experts had given the more persuasive and credible testimony. The Board stated that it considered the testimony of the public as it related to the visual impact of the monopole, but not as it related to the current quality of cellular service available in the Borough.
The Board discussed Smart SMR of N. Y., Inc. v. Bor. of Fair Lawn, 152 N.J. 309, 704 A.2d 1271 (1998), and stated that the Court had refused to grant "inherently beneficial" use status to wireless communications facilities. Reviewing plaintiffs' application under the standard set forth in Smart, the Board concluded that the proposed site is not particularly suited to the construction of a monopole because it is too small; is located in a residential zone; lacks adequate buffering; abuts several public schools; and is too close to residential property lines. While the Board acknowledged that wireless communications is an important public interest, it found that this positive criterion is not paramount because plaintiffs failed to prove a significant gap in coverage within the Borough. The Board listed adverse impacts such as visual aesthetics, reduced property values, commercial use in a residential *347 zone, and size of the proposed structure, and found that these negative criteria could not be minimized. On balance, the Board concluded that
the benefit to be obtained by the construction of the monopole, namely an alleged improvement in cellular communications, is substantially outweighed by the detrimental impact the construction of the monopole will have not only on the surrounding neighborhood, particularly with respect to real property values, but on the community as a whole in terms of visual impact.
The Board rejected plaintiffs' argument that the TCA requires that the application be granted. It found that plaintiffs did not provide the information necessary to evaluate the effective prohibition issue.
The data underlying the various exhibits marked into evidence was never supplied, and while made available to the Board's consultant, was not made available in a way that permitted proper analysis. Furthermore, the exhibits themselves were not sufficiently detailed to enable the Board to make proper findings. Rather, they consisted of maps, with overlays, showing areas where the applicants considered service to be acceptable, and areas where it was not considered acceptable. In light of the significant amount of information available to the applicants, including drive test data that permits signal strengths to be measured very precisely, and plotted accurately, the Board finds that it was within its right to request more detailed information.
In addition to failing to prove a significant gap in service, the Board found that plaintiffs had failed to establish that the area was not already served by another provider and that the construction of the proposed monopole was the least intrusive means of solving the problem.
On October 11, 2000 the Mayor and Borough Council adopted amendments to the zoning ordinance which repealed the permitted use of antennae and towers on municipal property and their conditional use in commercial and industrial zones. The new ordinance designated antennae and towers as permitted uses only in commercial and industrial zones. Further, the amendments changed the height limitation for towers from 50 feet to 150 feet and the size limitation for accessory buildings from 100 square feet to 300 square feet.
On appeal, appellants do not challenge the legality of the amended ordinance. They also do not challenge the Board's findings under Smart SMR of N. Y., Inc. v. Bor. of Fair Lawn, 152 N.J. 309, 704 A.2d 1271 (1998). Rather, the crux of appellants' argument is focused on the preemptive effect of the TCA when a local zoning board's refusal to allow construction of a wireless communications facility results in a significant gap in service.

III
Appellants first contend that the trial judge erred in holding that the volunteer fire department lacked authority to lease its property to plaintiffs. They contend that as a private, non-profit corporation, the fire department is authorized by N.J.S.A. 15A:3-1(a)(4), to enter into leases without complying with the Local Lands and Building Law, N.J.S.A. 40A:12-14.
The Law Division judge held that
in accordance with the fact that [the fire department] is a public entity or at least a quasi-public entity, it must conform with 40A:12-14, when leasing any property, even assuming they had the power to do that, which no one has demonstrated on this record it had in a commercial setting, the power to do.
*348 The judge also stated that "until and unless somebody shows me that [the municipality] gave this firehouse the right to carry on a commercial lease, there is no way they are entitled to do that, in municipal law in the State of New Jersey." The judge found that the lease between plaintiffs and the fire department was void ab initio.
Volunteer fire companies are private entities, organized pursuant to State laws governing the formation of non-profit corporations. Raritan Engine Co. No. 2 v. Edison Tp., 184 N.J.Super. 159, 162-63, 445 A.2d 443 (App.Div.1982); N.J.S.A. 15A:2-1(a). The fact that a volunteer fire company serves a public purpose or enjoys the support of public funds or property does not necessarily divest it of its private character. Raritan Engine Co. No. 2, 184 N.J.Super. at 164-65, 445 A.2d 443.
N.J.S.A. 15A:3-1(a)(5) provides that "[e]ach corporation, subject to any limitations provided in this act or other statute of this State, or in its certificate of incorporation or bylaws, may sell, convey, mortgage, create a security interest in, lease, exchange, transfer and otherwise dispose of its property and assets." (emphasis added). Further, N.J.S.A. 15A:3-1(a)(14) provides that a nonprofit corporation may
participate with others in any corporate entity, partnership, limited partnership, joint venture, or other association of any kind, or in any transaction, undertaking or arrangement which the participating corporation would have power to conduct by itself, whether or not that participation involves sharing or delegation of control with or to others.
In Brown v. Wildwood Vol. Fire Co. No. 1, 228 N.J.Super. 556, 564, 550 A.2d 520 (Ch.Div.1988), the judge held that a volunteer fire company could hire employees to operate a for-profit recording studio on boardwalk property it had leased from the municipality. In so doing, the judge found that "a volunteer fire company is empowered to engage in all of the lawful activities in which any other non-profit corporation may engage." Ibid. The judge cited the Nonprofit Law Revision Committee's statement that N.J.S.A. 15A:3-1(a)(14) specifically permits a nonprofit corporation to participate with business corporations in joint endeavors for economic gain. 228 N.J.Super. at 565, 550 A.2d 520.
Moreover, there are several instances in the case law where litigation has peripherally involved leases executed by volunteer fire departments. For example, in DErcole v. Mayor and Council of Norwood, 198 N.J.Super. 531, 534, 487 A.2d 1266 (App.Div.1984), citizens challenged an ordinance which would have authorized the borough to enter into a twenty-year lease of property owned by a volunteer fire company. The contested issue was whether the ordinance constituted an unconstitutional guaranty of a corporation's long term mortgage debt, and not whether the fire company was authorized to enter into the lease in the first place, a proposition not drawn in question. Id. at 536, 487 A.2d 1266. Similarly, in Kingwood Tp. Vol. Fire Co. No. One v. Bd. of Adjustment, 272 N.J.Super. 498, 500-01, 640 A.2d 356 (Law Div.1993), declined to follow on other grounds, Northeast Towers Inc. v. West Paterson Bd. of Adjustment, 327 N.J.Super. 476, 744 A.2d 190 (App.Div. 2000), the court entertained an action in lieu of prerogative writs arising from the denial of a use variance to construct a communications tower. The local volunteer fire department had entered into a lease agreement with Bell Atlantic to replace the department's existing tower with a larger one. At no point did the court question the authority of the fire department to enter into such a lease agreement. Id. at 500-11, 640 A.2d 356.
*349 In support of the decision in the case before us, the Law Division judge cited Willingboro Tp. v. Mobil Oil Corp., 159 N.J.Super. 593, 388 A.2d 1014 (App.Div.), certif. denied, 78 N.J. 401, 396 A.2d 588 (1978), and Bd. of Fire Comm'rs v. Cascella, 326 N.J.Super. 142, 147, 740 A.2d 707 (Law Div.1998), aff'd, 326 N.J.Super. 83, 740 A.2d 675 (App.Div.1999). Neither of these cases stands for the proposition that a volunteer fire department cannot enter into a commercial lease agreement.
In Cascella, the court held that a board of fire commissioners lacks the authority to initiate a condemnation action. 326 N.J.Super. at 149, 740 A.2d 707. Noting that the power of eminent domain must be conferred through an affirmative act by the Legislature, the court found that there is no such grant within the legislation establishing boards of fire commissioners. Id. at 147, 740 A.2d 707 (citing N.J.S.A. 40A:14-70). The holding in Cascella is not relevant to the case before us. First, a board of fire commissioners is a municipally-created body of elected officials, incorporated pursuant to N.J.S.A. 40A:14-70, and not a private, non-profit corporation. Moreover, even if Cascella applied to volunteer fire departments, the fact that an entity lacks the power of eminent domain does not mean that it also lacks the ability to enter into lease agreements. In fact, N.J.S.A. 40A:14-70 expressly grants a board of fire commissioners the authority to lease its real and personal property, albeit subject to the Local Lands and Buildings Law, N.J.S.A. 40A:12-13, -14.
In Willingboro, the township sought to condemn private property in order to build a firehouse for the local volunteer fire company. 159 N.J.Super. at 594, 388 A.2d 1014. The court held that even though the volunteer fire company was a private entity, the construction of a firehouse was a public purpose for which a municipality has the right to condemn property. Id. at 595, 388 A.2d 1014. Although the arrangement called for the volunteer fire company to lease the firehouse, the court observed that the township retained its right to terminate the lease and staff the station with paid firemen at a later date. Id. at 595-96, 388 A.2d 1014. Thus, Willingboro concerns the eminent domain power of a municipality and not limitations placed upon the authority of a volunteer fire company. To the extent that it is relevant at all, Willingboro serves as another historical example of a volunteer fire company leasing real property.
There is no question that courts have recognized the quasi-public nature of volunteer fire departments. See, e.g., Eggert v. Tuckerton Vol. Fire Co. No. 1, 938 F.Supp. 1230, 1240 (D.N.J.1996) (volunteer fire company considered state actor for purposes of § 1983); Schwartz v. Stockton, 32 N.J. 141, 150, 160 A.2d 1 (1960) (volunteer fire companies considered public entities for purpose of tort liability). However, even though a municipality may have the authority to control the general affairs of a volunteer fire department, it cannot dictate the day-to-day operations of the department. 63 C.J.S. Municipal Corporations § 542 (1999); see also N.J.S.A. 40A: 14-68 (members of volunteer fire company are under the supervision and control of the contracting municipality, but election of a chief remains the prerogative of the members).
Volunteer fire companies are authorized to lease their real property pursuant to N.J.S.A. 15A:3-1(a)(5). Such leases may be executed with corporate entities engaged in profit-making activities. N.J.S.A. 15A:3-1(a)(14); Brown v. Wildwood Vol. Fire Co. No. 1, 228 N.J.Super. at 564, 550 A.2d 520. Because the property involved is private and not public, volunteer fire companies are not constrained to comply *350 with the public bidding laws. N.J.S.A. 40A:12-14; cf. Sellitto v. Bor. of Spring Lake Heights, 284 N.J.Super. 277, 285, 664 A.2d 1284 (App.Div.1995), certif. denied, 143 N.J. 324, 670 A.2d 1065 (1996) (public bidding laws apply to municipal property). We find that the proposed lease between the Upper Saddle River Volunteer Fire Department and plaintiffs was authorized by statute, consistent with the case law, and not void ab initio.

IV
Appellants next contend that the denial of their application violates the TCA's mandate that a local zoning authority may not prohibit the provision of personal wireless services. They contend that because there are significant gaps in wireless services and the proposed monopole is the least intrusive means of filling those gaps, the Board's denial effectively prohibits the provision of wireless services in the Borough. Contending that a remand to the Board would be a waste of time, appellants ask us to order approval of their application.
The Board rejected plaintiffs' TCA claim, finding that they had not provided sufficient information to establish there is a gap in service. The Board also found that plaintiffs failed to establish that another provider is not serving the area or that the monopole is the least intrusive means of solving the problem.
Although the judge based her decision on the conclusion that the volunteer fire department's lease was void ab initio, she also made specific observations concerning plaintiffs' TCA argument. The judge stated:
There is not even a scintilla of evidence that there is any interruption in [the] tri-state [area's service], in this case, because here you're talking about an urban area fully covered by land lines
... As a matter of fact, the testimony was that there is ninetyat a minimum, ninety percent coverage for other servers in the town... There was no indication on this record of any objective standard, method by which any counting of service was done. There was no testimony about what efforts were made to obtain service through the utilization of existing towers that were apparently providing ninety percent coverage or more in the town, by the virtue of the subjective testimony on this record.... Then there is, as I had previously stated, pervasive, uninterrupted land line service everywhere in this region. As the wireless connections to it are in existence, but may not specifically be for this carrier, as optimal as the carrier seems to wish it.
Further, the judge found that "there are no highways at all in the alleged valley created by the alleged ridges of mountains, which apparently other carriers have overcome without locating towers smack dab in the center of a completely residential municipality."
Concerning the TCA itself, the judge found that
[t]here was no interruption in [service] as contemplated by 47 U.S.C. in this area of New Jersey. It certainly is not an interruption of interstate service. It certainly does not provide service to an area not otherwise covered by phone service, either land lines or wireless, which is the contemplation of this statute.... All that has to be shown is that there is a noninterrupted service by the carrier through the State of New Jersey to get elsewhere, which there clearly, unequivocally is here. So that there would be absolutely no basis to invoke the preemption of Title 47, as opposed to the clear statutory retention of local authority in zoning.
*351 With regard to the evidence presented by plaintiffs' experts, the judge stated:
[Y]ou hadn't shown there is zero service in that area, which is theirfrom your own witnesses' testimony, there is service, but in their offhand manner of driving throughI never heard of a scientist telling me thator any boardthat they drove through and that's why the board should rely on their data from just driving through. I just never heard of that as a scientific standard for any purpose, for any reason, under any statute, at all.... [T]hey didn't transmit [objective] information, assuming that was true, that they had some kind of actual data compiled by some machines that could be distributed to the Board's own expert, which apparently it was not.
The judge concluded that there was adequate evidence in the record to support the Board's finding that plaintiffs had failed in their proofs. However, the judge never expressly affirmed the Board decision, apparently basing the dismissal on the invalidity of the volunteer fire department contract.
The TCA was an overhaul of the federal regulation of communications companies, designed to provide a pro-competitive, deregulatory national policy which would accelerate private sector deployment of advanced technologies and services. Omnipoint Communications Enters. v. Newtown Tp., 219 F.3d 240, 242 (3d Cir.), cert. denied, 531 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000) (citing H.R. Conf. Rep. No. 104-458, at 206 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 1124). "Recognizing that the expanding telecommunications industry requires construction of wireless facilities, including communications towers, and that local governments are called upon to determine whether such structures may be built, Congress enacted section 704 of the TCA, codified at 47 U.S.C. § 332, to regulate, in part, this procedure." SiteTech Group Ltd. v. Bd. of Zoning Appeals of Brookhaven, 140 F.Supp.2d 255, 259 (E.D.N.Y. 2001).
"Section 332(c)(7) of the TCA expressly preserves the traditional authority enjoyed by state and local government to regulate land use and zoning, but places several substantive and procedural limits upon that authority when it is exercised in relation to personal wireless service facilities." APT Pittsburgh Ltd. P'ship v. Penn Tp., 196 F.3d at 473. Section 332(c)(7)(A), provides that except for the specifically enumerated limitations, nothing in the TCA shall affect the authority of a state or local government over decisions regarding the placement, construction, and modification of personal wireless service facilities. The power of local zoning authorities to regulate personal wireless service facilities is tempered, however, by the proviso that such regulation "shall not unreasonably discriminate among providers of functionally equivalent services" and "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C.A. § 332(c)(7)(B)(i). The TCA further requires that "[a]ny decision... to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C.A. § 332(c)(7)(B)(iii).
State statutes and local ordinances are preempted, under the Supremacy Clause of the United States Constitution, if they violate the terms of the TCA. Town of Amherst v. Omnipoint Communications Enters., Inc., 173 F.3d 9, 16 (1st Cir.1999) (citing H.R. Conf. Rep. No. 104-458 at 207-08).
Basically, the TCA gives local authorities the first say in determining where and how to construct [wireless communications *352 facilities]; if, however, a local authority's actions violate the provisions of the TCA, a court has the authority to order the locality to take such steps as are necessary to grant the relief which the wireless provider had originally requested from the locality.

[Omnipoint Communications MB Operations v. Town of Lincoln, 107 F.Supp.2d 108, 114 (D.Mass.2000).]
The effective prohibition provision, 47 U.S.C.A. § 332(c)(7)(B)(i)(II), which forbids local zoning authorities from prohibiting the provision of personal wireless services, has been the subject of litigation in federal court over the last several years. The lower federal court decisions interpreting this provision, while not binding on New Jersey courts, are entitled to respectful consideration in the interests of judicial comity. See Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 80, 577 A.2d 1239 (1990) (judicial comity helps to ensure uniformity and discourages forum shopping); State v. Norflett, 67 N.J. 268, 286, 337 A.2d 609 (1975) (state courts should give due respect to the decisions of the lower federal courts); Bor. of Wildwood Crest v. Smith, 235 N.J.Super. 453, 455, 563 A.2d 73 (Law Div.) (lower federal court decisions should be afforded consideration and respect), aff'd, 235 N.J.Super. 404, 563 A.2d 48 (App.Div.1988).
"The applicable standard of review for claims brought pursuant to the TCA varies according to the nature of the claim." Omnipoint Communications MB Operations v. Town of Lincoln, 107 F.Supp.2d at 114. In deciding whether a local zoning board's actions are supported by substantial evidence, the court is deferential to the opinion of the zoning authority and careful not to substitute its own judgment for that of the local board. Id. at 114-15. However, when deciding whether a zoning board's denial of an application to construct a personal wireless communications facility has the effect of prohibiting the provision of personal wireless services, the court applies a de novo review that is not necessarily limited to the record compiled by the local authority. APT Pittsburgh Ltd. P'ship v. Penn Tp., 196 F.3d at 475; accord Town of Amherst v. Omnipoint Communications Enters., Inc., 173 F.3d at 16 n. 7. "[T]he statutory bar against regulatory prohibition is absolute, and does not anticipate any deference to local findings." Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho-Ho-Kus, 197 F.3d 64, 71 (3d Cir.1999); see also Nextel West Corp. v. Unity Township, 282 F.3d 257, 265-66 (3d Cir.2002).
The de novo standard applies equally to appellate review, with no deference afforded to the trial court's factual findings. Of course, in the matter before us, there are no factual findings to review. The judge did not examine the evidence concerning effective prohibition de novo, but rather canvassed the record to see if the Board's decision was supported by competent evidence. Although the matter was decided after a "trial," no new evidence was introduced and the judge specifically stated that she was making no findings of facts. Thus, the matter presents itself for appellate review very much like a summary judgment. See APT Pittsburgh, Ltd., 196 F.3d at 475 (reasoning that questions of effective prohibition and federal preemption are legal issues, not subject to deferential judicial review). The circuit courts in Amherst and Ho-Ho-Kus, reviewed the district courts' findings de novo, although admittedly the matters arose on motions for summary judgment. New Jersey courts have never specifically considered this issue, although in N.Y. SMSA Ltd. P'ship v. Bd. of Adjustment of Middletown, 324 N.J.Super. 166, 173-75, 734 A.2d 826 (App.Div.), certif. denied, 162 *353 N.J. 488, 744 A.2d 1210 (1999), the court clearly considered the evidence concerning effective prohibition de novo when reversing the judgment of the Law Division.
The leading federal decision interpreting the effective prohibition provision is Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630 (2d Cir.1999), in which the Second Circuit upheld a local planning board's denial of Sprint's applications to construct three wireless communications facilities. The court reasoned that the meaning of the effective prohibition provision must lie somewhere between the extremes posited by Sprint's claim that any denial of an application to build a wireless communication facility constitutes a violation of the TCA and the Planning Board's position that, absent an explicit policy banning wireless communications facilities, no individual decision could ever constitute a prohibition of services. Id. at 639-41. Employing a painstaking analysis to determine the meaning of "personal wireless services," the Second Circuit concluded that the TCA proscribes local government from prohibiting "for-profit radio communication services carried on between mobile stations or receivers and land stations that (1) are connected to the national telephone network and that (2) provide wireless phones with access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." Id. at 641-42. The court stated:
the plain focus of the statute is on whether it is possible for a user in a given remote location to reach a facility that can establish connections to the national telephone network[,] ... local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines.

[Id. at 643.]
However, the court held that a local government may reject an application to construct a wireless communication facility in an under-served area, if the service gap can be closed by less intrusive means. Ibid. The Second Circuit also observed that "once an area is sufficiently serviced by a wireless service provider, the right to deny applications becomes broader." Ibid. If a provider is already servicing the area, subsequent applications by other providers may be denied, subject to 47 U.S.C.A. § 332(c)(7)(B)(i)(I), which prohibits unreasonable discrimination among service providers. Ibid.
The Third Circuit quickly embraced the Willoth analysis in APT Pittsburgh Ltd. P'ship v. Penn Tp., 196 F.3d at 480, where it found that Willoth's holding "preserves the authority of state and local land use planners to the maximum extent consistent with assuring the access of remote users of personal wireless services to the national telephone network." The Third Circuit held that in order to establish a violation of § 332(c)(7)(B)(i)(II),
the provider must show that its facility will fill an existing significant gap in the ability of remote users to access the national telephone network. In this context, the relevant gap, if any, is a gap in the service available to remote users. Not all gaps in a particular provider's service will involve a gap in the service available to remote users. The provider's showing on this issue will thus have to include evidence that the area the new facility will serve is not already served by another provider.
Second, the provider applicant must also show that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve. This will require a showing that a good faith effort has been made to identify and evaluate *354 less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc.

[Ibid. (footnote omitted).]
In Ho-Ho-Kus, 197 F.3d at 70, the Third Circuit embellished the Willoth court's analysis by adding that "there is a `gap' in personal wireless services when a remote user of those services is unable either to connect with the land-based national telephone network, or to maintain a connection capable of supporting a reasonably uninterrupted communication." The court declined to define what constitutes a "significant" gap in service, but observed that it matters a great deal whether the gap covers merely a small residential cul-de-sac or whether it straddles a large highway or commuter railway. Id. at 70 n. 2. In the later case, the total disruption caused by the lack of service could be quite significant. Ibid.
In a decision pre-dating Willoth, the First Circuit observed that while an individual denial is not automatically a forbidden prohibition of wireless services, some individual decisions can be shown to constitute an effective prohibition under certain circumstances. Amherst, 173 F.3d at 14. The court held that the burden on a carrier invoking § 332(c)(7)(B)(i)(II) is a heavy one: "to show from language or circumstances not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." Ibid.
Subsequently, a district court in the First Circuit adopted the Willoth analysis, but modified it to conform with the holding in Amherst. Town of Lincoln, 107 F.Supp.2d at 117. The court held that in order to succeed on an effective prohibition claim, a provider must establish that the zoning authority's decision resulted in a significant gap in wireless services within the community and that further reasonable efforts to correct the problem are so likely to be fruitless that it is a waste of time even to try. Id. at 118. Thus, instead of applying the "least intrusive means" test to the application, the court required the applicant to demonstrate from language or circumstances that further reasonable efforts to locate a wireless communications facility within the community would be futile. Amherst, 173 F.3d at 14.
District courts in the Second and Ninth Circuits have recently combined Willoth and Amherst by requiring wireless service providers to prove both that their proposal is the least intrusive means of closing a substantial gap in service and that further reasonable efforts to locate a site within the municipality are so likely to be fruitless that it is a waste of time even to try. SiteTech Group Ltd. v. Bd. of Zoning Appeals of Brookhaven, 140 F.Supp.2d at 265; Airtouch Cellular v. City of El Cajon, 83 F.Supp.2d 1158, 1166-68 (S.D.Cal.2000).
The analysis applied by the Fourth Circuit differs somewhat from Willoth and Amherst and is worth considering. In AT & T Wireless PCS, Inc. v. City Council of Virginia Beach, 155 F.3d 423, 428 (4th Cir.1998), the court held that the effective prohibition provision "only applies to `blanket prohibitions' and `general bans or policies,' not to individual zoning decisions." In so doing, the court reasoned that applying § 332(c)(7)(B)(i)(II) to individual zoning decisions would nullify local authority by mandating the approval of all applications. Ibid. The Fourth Circuit recognized, however, that "policies that do not explicitly ban new service but do, when applied on a case-by-case basis, guarantee the rejection of every single application" might also violate the TCA. Id. at 429. The court in Willoth expressly disagreed with the reasoning in Virginia Beach, finding *355 that the Fourth Circuit's interpretation of the effective prohibition provision would render it a superfluous directive to consider applications on a case-by-case basis. Willoth, 176 F.3d at 640.
In 360 Degree Communications Co. of Charlottesville v. Bd. of Supervisors of Albemarle Cty., 211 F.3d 79 (4th Cir.2000), the Fourth Circuit retreated somewhat from its position in Virginia Beach. The court insisted that "case-by-case denials of permits for particular sites cannot, without more, be construed as a denial of wireless services," yet admitted that "conceptually, if wireless service could feasibly be provided from only one site, a denial of a permit for a facility at that site could amount to a prohibition of wireless services." Id. at 86-87. The court criticized Willoth's "least intrusive means" analysis, stating that it reads too much into the TCA, unduly limiting what is essentially a fact-bound inquiry. Id. at 87. "A community could rationally reject the least intrusive proposal in favor of a more intrusive proposal that provides better service or that better promotes commercial goals of the community." Ibid. Somewhat circuitously, the court then observed that application of the Willoth rule quickly devolves into the broader question of whether the denial of the particular permit at issue has the effect of prohibiting wireless service. Ibid. Finally, the court found that "[i]f we assume that significant gaps are determined to exist," the best method for determining whether there has been a prohibition of service is the test set forth in Amherst. Id. at 87-88. In essence, then, the court in Albemarle is applying the same analysis used in Town of Lincoln, Airtouch and SiteTech, which combines elements of Willoth with Amherst's requirement that the applicant show that future reasonable efforts would be futile.
Although New Jersey courts have yet to formally adopt the analysis employed in the Third Circuit, our decisions have generally followed the evolving approach of the federal courts. In Smart SMR of N.Y., Inc. v. Bor. of Fair Lawn Bd. of Adjustment, 152 N.J. at 326, 704 A.2d 1271, the Supreme Court observed that while the TCA's restrictions on local land use agencies parallel the New Jersey Municipal Land Use Law in some respects, they impose greater limitations in others. Referring to § 332(c)(7)(B)(i)(II), the Court stated in dicta that "although municipal boards may regulate the location of mobile communications facilities, they may not altogether prohibit them from being constructed within the municipality." Ibid. This statement seems to imply that as long as a zoning board allows construction of wireless communications facilities somewhere within the municipality, it satisfies the mandate of the TCA. However, such an interpretation of the effective prohibition provision has consistently been rejected by the federal courts. See Town of Lincoln, 107 F.Supp.2d at 117 n. 8 (stating a town would violate the TCA if it allowed wireless facilities to be built on only one parcel within the town, if wireless coverage generated from that site was insufficient to provide coverage throughout the town). For that reason, the Court's passing characterization of § 332(c)(7)(B)(i)(II) in Smart should not be interpreted as formulating a rule applicable in subsequent cases. The Supreme Court recently revisited Smart in another respect reaffirming its earlier decision and declining to "find that wireless communication facilities are inherently beneficial uses, finding instead that the best course is one that maximizes the use of expert testimony and encourages the development of a substantial record to demonstrate both the positive and negative criteria." Cell South of N.J. v. Zoning Bd. of Adjustment of West *356 Windsor Tp., 172 N.J. 75, 86-87, 796 A.2d 247 (2002).
In N.Y. SMSA Ltd. P'ship v. Bd. of Adjustment of Middletown, 324 N.J.Super. at 173-75, 734 A.2d 826, this court rejected a wireless provider's argument that the denial of its application resulted in a gap in coverage, thus violating § 332(c)(7)(B)(i)(II). Testimony in the record indicated that the provider wished to attain signal strengths in excess of -75 dBm and that the existing level of coverage in the area was above -100 dBm. Id. at 176-77, 734 A.2d 826. In support of its decision, we cited portions of the district court opinion in Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho-Ho-Kus, 24 F.Supp.2d 359, 372 (D.N.J.1998), which was subsequently reversed by the Third Circuit in Ho-Ho-Kus. Thus, we applied the later-vacated rule that "[a]s long as the Board's decision was not an attempt to prohibit personal wireless service altogether... local land use law is controlling." Middletown, 324 N.J.Super. at 176, 734 A.2d 826. This is very much akin to the Fourth Circuit's rule in Virginia Beach. Indeed, this court in Middletown held that the decision did not violate the TCA because "there is neither a moratorium nor a blanket prohibition, just one decision in a municipality that permits wireless facilities in other locations." Ibid. However, this court proceeded to recognize the Second Circuit's holding in Willoth requiring the proposed plan to be the least intrusive means for closing a significant gap in service. Ibid. Under the circumstances, we found that the provider had not established that there was a need for additional service or that alternate sites could not provide adequate coverage. Id. at 176-77, 734 A.2d 826. Thus, in effect, we applied the rules followed in both the Third and Fourth Circuits in arriving at our conclusion.
In Northeast Towers, Inc. v. Zoning Bd. of Adjustment of West Paterson, 327 N.J.Super. 476, 500-01, 744 A.2d 190 (App. Div.2000), this court summarized § 332 of the TCA, but found that it was inapplicable where "no evidence in the record indicated that failure to permit the construction or continued use of plaintiff's communications tower would have the effect of prohibiting coverage outright." "The Board's decision acted as neither a moratorium nor a blanket prohibition, but was just one decision in a municipality that permits wireless facilities in other locations." Id. at 501, 744 A.2d 190. Again, this is very similar to the Fourth Circuit's analysis in Virginia Beach.
In Omnipoint Communication, Inc. v. Bd. of Adjustment of Bedminster, 337 N.J.Super. 398, 423-25, 767 A.2d 488 (App. Div.), certif. denied, 169 N.J. 607, 782 A.2d 425 (2001), we remanded to the local board to determine whether the denial of Omnipoint's application would result in substantial gaps in coverage. We found that "[t]he record as developed is barren of evidence to establish that the Board's decision had the effect of prohibiting wireless service in the area." Id. at 423, 767 A.2d 488. We "recognized" the Third Circuit's decision in Ho-Ho-Kus, yet did not formally adopt the rule set out in that decision. Id. at 423-24, 767 A.2d 488. Nevertheless, we discussed the holding in Ho-Ho-Kus and noted that "even if the Board finds significant gaps in existing service, the providers still bear the burden of proving that the proposed facility is the least intrusive means of filling those gaps with a reasonable level of service." Id. at 425, 767 A.2d 488. Thus, we fell into line with the rule of the Third Circuit.
All of these cases evince the intent of our courts to follow the Third Circuit's interpretation of the TCA. We review the record de novo in order to decide whether *357 plaintiffs proved that there is a significant gap in the ability of remote users to access the national telephone network. Willoth, 176 F.3d at 643. In making that determination, we consider whether plaintiffs proved that the area is not already being served by another wireless communications provider. Penn Tp., 196 F.3d at 480. Further, we must decide whether plaintiffs proved that the proposed facility is the least intrusive means to close the gap in service. Willoth, 176 F.3d at 643. In so doing, we also consider whether plaintiffs made a good faith effort to identify and evaluate less intrusive alternatives. Penn Tp., 196 F.3d at 480.
Finally, we must seriously consider whether requiring plaintiffs to show that further reasonable attempts to build a wireless communication facility to fill the gaps in service would likely be fruitless and a waste of time. Amherst, 173 F.3d at 14. In reality, this requirement adds little to the analysis other than allowing local zoning boards to opt for a facility location that is objectively more intrusive, but which may be preferable for political or social reasons. By adopting this requirement, we conform with the most recent decisions of the federal courts, which seem to be converging on a rule that combines the Willoth and Amherst tests. See, e.g., Albemarle Cty., 211 F.3d at 88; Brookhaven, 140 F.Supp.2d at 265; Lincoln, 107 F.Supp.2d at 117; El Cajon, 83 F.Supp.2d at 1167.
We find it clear that plaintiffs proved there is a significant gap in personal wireless communications services in the Borough. All of the expertsincluding the Board's own consultantwere in complete agreement on this issue. A large section of the Borough is located within a bowl-shaped valley, with very steep hills to the east and west. This unique topography makes it impossible for a wireless communications antenna located on a nearby ridge to provide reasonable service within the valley. Because radio waves at the frequencies allotted to wireless service providers travel in straight lines and do not pass through terrain and foliage, it is impossible for them to "reach down" into the valley from the outside without creating substantial no-coverage "shadows." The Board's consultant, Hecht, thought this was such an obvious proposition that no further testing was necessary in order to verify a lack of service in the valley.
Nevertheless, plaintiffs each provided the Board with propagation studies which reflected huge gaps in coverage within the Borough. Sprint had no coverage within the valley portion of the Borough. Omnipoint lacked coverage in 80% to 90% of the Borough. Bell Atlantic covered only about 50% of the Borough. These studies were derived from actual drive-tests in which signal strength was measured by sophisticated electronic equipment and coordinated with GPS data specifying exact geographic locations throughout the valley. Similar computer-generated propagation studies have been accepted as evidence of wireless communications coverage levels in federal court. See Willoth, 176 F.3d at 636 (Sprint submitted signal propagation data depicting its signal strength within the municipality); Town of Lincoln, 107 F.Supp.2d at 119 n. 11 (use of computer projections of coverage levels is "common practice in the telecommunications industry").
At the Board's request, plaintiffs prepared maps of the Borough showing three levels of signal strength (good, average and poor). Plaintiffs also allowed Hecht to examine the actual drive-test plots used to generate the propagation studies. Bell Atlantic[1] *358 and Omnipoint assigned specific values to the plotted signal levels, which Hecht stated were in compliance with general standards normally used by most of the companies. Hecht stated that the drive-test plots confirmed that Bell Atlantic and Omnipoint did not provide reliable coverage within the valley.
In addition, Hecht methodically traveled to various locations throughout the Borough and attempted to place phone calls using two standard Sprint telephones. He was unable to connect with the national telephone network 90% of the time. He made similar attempts using a Bell Atlantic telephone and found many areas where a call could not be maintained or initiated.
In light of this competent and consistent evidence, the Board's insistence that it be presented with "raw data" was patently unreasonable. Following Hecht's initial testimony, counsel for the Board stated that Board members were not qualified to analyze or interpret the drive-test data and asked that the additional requested information be provided to Hecht instead. Subsequently, Hecht testified that plaintiffs provided him with all of the information that he needed and that he had, indeed, seen the "raw data." Hecht explained to the Board that it was pragmatically impossible to examine the bits of electronic information that were collected and immediately transmitted to the computer for plotting. The plots that he saw reflected the reality of what the instruments were detecting.
The Board's finding that the data underlying the exhibits was never made available to it or to its consultant in a way that permitted a proper analysis has no support in the record and is directly contradicted by Hecht's testimony. Further, its finding that the expert testimony and exhibits were insufficient to prove a significant gap in service within the Borough is also without basis. The expert testimony, propagation plots, drive-test plots, and Hecht's first-hand observations overwhelmingly showed that a minimum of 50% of the Borough was without reliable personal wireless services. While courts have never clearly defined what constitutes a "significant" gap in coverage, see Ho-Ho-Kus, 197 F.3d at 70, a gap which encompasses more than half of a municipality is clearly not de minimus, as defined in Willoth as holes in coverage "such as the interiors of buildings in a sparsely populated rural area" or a limited number of houses in a confined area. Willoth, 176 F.3d at 643-44.
In light of plaintiffs' overwhelming and uncontroverted evidence, the Board's conclusion that they failed to prove the existence of a significant gap in coverage within the Borough was erroneous as a matter of law. The record also establishes that no other wireless service provider adequately covers the Borough. There are five known carriers licensed to provide wireless communication services in the Borough area: Sprint, Omnipoint, Bell Atlantic, AT & T and Nextel. Three of these carriers, Sprint, Omnipoint, and Bell Atlantic, proved that their coverage was inadequate at the Board hearings. Little evidence was introduced concerning AT & T, except that it had withdrawn its original request *359 to collocate on the monopole and that the fire department, which subscribed to AT & T, experienced "dead spots" all over the Borough, including at the fire station. No evidence of substance was submitted concerning Nextel.
However, there was clear and uncontradicted testimony from the experts that, in order to provide coverage to the valley, a wireless communication provider must have an antenna located inside the valley. As Hecht fully explained, regardless of who the carrier is, it is physically impossible to provide coverage from outside the valley. Sprint provided the Board with an "Inventory of Existing SitesBorough of Upper Saddle River & Vicinity." The only communications towers located within the Borough are a cell site on Crescent Avenue, near Route 17, occupied by Bell Atlantic, Sprint and AT & T, and the police department's radio tower at the municipal complex. The only Nextel site listed is in Mahwah at Island Road and Route 17. Thus, neither AT & T nor Nextel has a wireless communication facility within the valley and the sites that they occupy along Route 17 cannot reach down into the valley to provide coverage. Neither AT & T nor Nextel has reliable coverage in the portion of the Borough that is within the valley.
Given the difficulty of proving a negative, especially in a competitive industry where even the most basic information is considered proprietary, this evidence is sufficient to establish that no other wireless service provider covers the valley. At the very least, it creates a rebuttal presumption of non-coverage which the Board did not overcome. Thus, the Board's finding that plaintiffs failed to prove that the area was not covered by another provider was erroneous.
Finally, plaintiffs presented sufficient evidence to prove that their proposed monopole is the least intrusive means of closing the gap in service. In order to provide service within the valley portion of the Borough, the wireless communication facility must be located within the valley. Sprint's RF expert testified that constructing the monopole on the fire department's property would be ideal because it is centrally located and would serve almost the entire valley. Indeed, any site within about 500 to 1000 feet of the fire station, including the municipal complex across the street, would satisfy the technical requirements for good coverage.
Plaintiffs attempted to secure leases from the Borough in order to place the monopole at the municipal complex or at another suitable municipal site within the valley. The Borough refused to lease any property to plaintiffs, except for some commercially zoned land outside of the valley near Route 17. The remaining property inside the valley, not owned by the Borough, is all residential. The commercially zoned portion of the Borough is along Route 17, to the west of the municipal center and outside the valley.
In order to locate the monopole within the valley on non-municipal land, plaintiffs would need to secure a lease from a private residential property owner. Locating the monopole on a private, residential lot would clearly be more intrusive than placing it at the fire department. Such a plan would provide even less space for setbacks and buffering and create an even greater aesthetic detriment. At the fire department, the monopole would replace an existing tower and would not be inconsistent with the area's community center character. Further, the visual impact from the monopole would be somewhat diminished by the location of the 100-foot-high police tower across the street. Moreover, the fire department, and hence the community, would benefit from the enhanced communications obtained by placing the fire department's *360 antenna atop the monopole, at no cost to the Borough.
Plaintiffs' experts discussed less intrusive alternatives and explained why none was viable. A large antenna transmitting from outside the valley would not work because of shadowing, interference, and capacity problems. A shorter monopole would not be possible; collocation requires a ten-foot separation between each antennae array, and the fire department's antenna requires fifteen feet. Because high-frequency radio waves cannot penetrate foliage, antennae must be located above the tree linea minimum of eighty-feet. Thus, the alternative to a 155-foot-high monopole hosting three providers would be three eighty-foot monopoles each hosting one provider. This solution would have an even greater potential impact on visual aesthetics and perhaps on property values.
In light of the Borough's topography and demographics and its refusal to lease municipal property within the valley to plaintiffs, location of the monopole on the fire department's property is the least intrusive means of closing the gap in personal wireless coverage. The Board's finding to the contrary was erroneous.
We also conclude that plaintiffs have proved that any further reasonable attempts to secure a permit to build a monopole within the valley portion of the Borough are quite likely to be futile. From the first hearing, it was clear that the Board was strongly opposed to granting plaintiffs' application. For example, after the testimony of Sprint's RF expert, the Board chairman commented that "we'll need to have some independent testimony, which we will have, to obviously offset Mr. Grunwald's testimony." Throughout the proceedings, Board members were hostile and suspicious of plaintiffs' witnesses, often accusing them of lying or falsifying data. There is no reason to believe the Board's attitude will change if plaintiffs apply for variances to locate the monopole at an even more intrusive site. Moreover, the municipal property in the vicinity of the fire station represents an ideal location, yet the Borough has flatly refused to lease it to plaintiffs. Thus, any further effort to obtain a lease from the Borough will certainly be futile. Under these circumstances, we find plaintiffs have shown that further reasonable efforts to locate a facility within the valley are likely a fruitless waste of time.
The factual observations of the trial court are inexplicable, given the record in the Law Division. The judge must have simply misunderstood the testimony before the Board. There was ample evidence concerning the method by which the propagation studies were obtained and plaintiffs presented hard, objective measurements of signal strength to the Board's consultant. The technicians did not simply "drive through" the community. No one ever testified that there was 90% coverage by other servers in the town. The main portion of the Borough sits within a valley and there are obviously highways within it. Further, the fact that the Borough is already served by land-lines is of no consequence. The purpose of the TCA is to facilitate the deployment of wireless communications services. Newtown Tp., 219 F.3d at 242. Section 332(c)(7)(B)(i)(II) proscribes local government from prohibiting the provision of personal wireless services. There is no proviso that the section is inapplicable if land-line service is available. Finally, the trial judge was obliged to review the evidence de novo in making a determination of whether there was an effective prohibition of wireless services.
The trial judge's conclusion that there was adequate evidence in the record to support the Board's finding was clearly *361 erroneous. Due to the Board's reluctance to properly consider the evidence in the record, our appropriate resolution is not a remand, but an order directing approval of the variances. New Brunswick Cellular Tel. Co. v. South Plainfield Bd. of Adjustment, 160 N.J. 1, 16-17, 733 A.2d 442 (1999); see also Cell South of N.J., 172 N.J. at 90-91, 796 A.2d 247.
We need not consider plaintiffs' final point, the grant of an equitable "builder's remedy" per Southern Burlington Cty. NAACP v. Mt. Laurel Tp., 92 N.J. 158, 456 A.2d 390 (1983). We vacate the order of dismissal in the Law Division and reverse and remand for the entry of an order requiring the Board to approve plaintiffs' application.
Reversed and remanded.
NOTES
[1] Bell Atlantic's RF expert testified that Bell Atlantic considered signals which fell below -85 dBm to be unreliable. For comparison, in Middletown, 324 N.J.Super., at 176, 734 A.2d 826, the wireless provider considered signal levels less than -75 dBm to be undesirable. (dBm, or "decibels above one milliwatt," is a measure of power equal to ten times the logarithm of the ratio of the signal strength over one milliwatt. McGraw-Hill Dictionary of Scientific and Technical Terms 418 (3d ed.1984). Thus, a signal of -85 dBm, which is equal to 3.16X10 -12 watts, is ten times weaker than a signal of -75 dBm.)